UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

Star Island Vacation Ownership
Association, Inc.

Case No.: 6:25-bk-07207-GER
Chapter 11, Subchapter V

    Debtor.
_____/

**UNITED STATES TRUSTEE'S LIMITED OBJECTION
TO DEBTOR'S EXPEDITED MOTION FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTOR TO (A) CONTINUE TO USE EXISTING CASH
MANAGEMENT SYSTEM, (B) MAINTAIN BANK ACCOUNTS AND
CONTINUE USE OF EXISTING BUSINESS FORMS AND CHECKS, AND (C)
HONOR CERTAIN RELATED PREPETITION AND POSTPETITION
OBLIGATIONS, (II) DETERMINING COMPLIANCE WITH, OR
GRANTING A WAIVER OF, CERTAIN INVESTMENT
AND DEPOSIT GUIDELINES, AND (III) GRANTING RELATED RELIEF**

The Acting United States Trustee for Region 21, Guy A. Van Baalen ("U.S. Trustee"), by and through his undersigned counsel, objects to *Debtor's Expedited Motion for Interim and Final Orders (I) Authorizing Debtor to (A) Continue to Use Existing Cash Management System, (B) Maintain Bank Accounts and Continue Use of Existing Business Forms and Checks, and (C) Honor Certain Related Prepetition and Postpetition Obligations, (II) Determining Compliance with, or Granting a Waiver of, Certain Investment and Deposit Guidelines, and (III) Granting Related Relief* ("Cash Management Motion" or "Motion"; Doc. No. 7) filed by Star Island Vacation Ownership Association, Inc. ("Debtor"). In support, the U.S. Trustee states as follows:

**SUMMARY OF ARGUMENT**

In the Cash Management Motion, the Debtor moves the Court for authority to disregard required investment and deposit statutory rules and guidelines, and for authorization to: (i) continue using its existing cash management system; (ii) maintain bank accounts and continue

the use of existing business forms and checks; (iii) honor related prepetition and postpetition obligations; and (iv) obtain related relief.

As of the Petition Date, the Debtor claims to have almost $11.5 million dollars in 3 bank accounts across 3 financial institutions. The Debtor seeks to maintain all the existing accounts rather than moving or converting them to bonded or collateralized debtor-in-possession ("DIP") accounts. Section 345(b) of the Bankruptcy Code and the UST Guidelines were promulgated to ensure that bankruptcy estate funds are deposited or invested prudently, safely, and protected for the benefit of creditors. Although this Court, for cause, can approve deposits other than those permitted by section 345(b), the Debtor has failed to establish such necessary cause.

The Debtor argues that the Cash Management System is "tailored to meet its operating needs"… and "any disruption to the Cash Management System would have an immediate adverse effect on the Debtor's operating and maintenance of the Property to the detriment of the Debtor's estate and all Association Members." (Motion at 5-7.) The Debtor, however, fails to explain why its justification for an absolute waiver outweighs the Section 345(b) account collateralization or bonding requirement, or the vital policy consideration that estate funds be held in a safe and prudent manner. Notably, 2 of the 3 bank accounts are financial institutions authorized and capable of opening DIP accounts or converting the Bank Accounts into DIP accounts. So, the Debtor's claim of disruption must be viewed with a measure of skepticism.

The Debtor has not alleged that its Banks refuse to open or convert accounts to DIP accounts, or that the Debtor has requested such conversions, or that such conversions unto themselves would be unduly disruptive. The Debtor does not even move the Court for greater time to establish DIP accounts with its existing Banks. The Debtor instead seeks to be excused

completely from complying with the Section 345(b) and the relevant UST Guidelines in this regard. The Debtor has not met its burden to establish "cause" for such an absolute waiver.

To the extent the Debtor seeks brief interim relief, the U.S. Trustee does not object so long as such interim relief is conditioned upon the Debtor taking steps to transition its banking to DIP accounts and comply with the United States Trustee Guidelines within a short time frame. Recent bank failures demonstrate that the risks of loss are not hypothetical or conjectural. Any inconvenience in transitioning funds from the Debtor's current Bank Accounts to DIP accounts (particularly at the same institutions) is strongly outweighed by the statutory mandate to secure estate funds from risk of loss.

## BACKGROUND

1. On November 6, 2025 ("Petition Date"), the Debtor commenced this Subchapter V Chapter 11 bankruptcy case by filing a voluntary petition (Doc. No. 1; "Petition") in the Middle District of Florida, Orlando Division.

2. The Debtor continues to operate their business and manage their properties as debtors-in-possession under sections 1107 and 1008 of the Bankruptcy Code.

3. The *Chapter 11 Case Management Summary* (Doc No. 5) indicates the Debtor intends to sell the property located at 5000 Avenue of the Stars, Kissimmee, Florida which includes 184 condominium units of the Star Island Resort.

4. As part of a suite of "First Day" motions, the Debtor filed the Cash Management Motion, seeking, *inter alia*, the continued use of its existing cash management system, and a waiver of the investment and deposit statutory rules and guidelines set forth in 11 U.S.C. Section 345(b) and the UST Guidelines.

5. According to the Debtor, its integrated Cash Management System is comprised of 3 bank accounts across 3 financial institutions. (Motion at 16.) As of the Petition Date, the Debtor has the aggregate amount of approximately $11.5 million in the Bank Accounts.

6. The Debtor alleges that two of the accounts are maintained at Banks that are approved by the USTP as DIP depositories in the Middle District of Florida, including Wells Fargo Bank, N.A. and Comerica Bank. (Motion at 6.)

7. The Debtor's Cash Management System is composed of: (i) a "Operating Account" into which cash generated from the Debtor's operations is deposited and used to fund the Debtor's expenses; (ii) a "Reserve Account" into which the Debtor deposits money for major repairs and maintaining the value of the Property; and (iii) a "Tax Account" into which the Debtor segregates cash needed to make its real property tax payments. (*Id.* at 6-7.)

## **ARGUMENT**

### A. Applicable Law and Guidelines

8. Section 345 of the Bankruptcy Code governs the management of money of the estate by a trustee or debtor in possession. Section 345(b) requires generally that, unless the Court orders otherwise for "cause," estate funds must be either: (i) insured, guaranteed, or backed by the full faith and credit of the United States or its agencies; (ii) bonded with the approval of the United States Trustee; or (iii) collateralized by the deposit of securities in accordance with 31 U.S.C. § 9303. *See* 11 U.S.C. § 345.

9. The U.S. Trustee is directed by statute to supervise the administration of all chapter 11 cases. *See* 28 U.S.C. § 586(a)(3). Section 345(b) mandates, among other things, that debtors and trustees deposit or invest estate money to safeguard the money for the benefit of the debtor's creditors. 11 U.S.C. § 345(b); 3 *Collier on Bankruptcy* ¶ 345.04 (16th ed. 2022) ("Section 345(b)

mandates that certain precautions be taken against the loss of the funds of the estate through deposit or investment in order to protect the creditors of the estate.").

10. To ensure that those parties meet their obligations under section 345, the U.S. Trustee monitors fiduciaries and depositories, and requires that chapter 11 estate assets be held in debtor-in-possession accounts at "Authorized Depositories"—*i.e.*, those that have entered into a Uniform Depository Agreement ("UDA") with the United States Trustee Program. *See* United States Trustee Program Policy and Practices Manual, Volume 7, "Banking and Bonding," (the "Manual"), § 7-1.1, pp. 1-2).[1] *See also* UST Guidelines ¶ 5 (mandating that all debtor-in-possession bank accounts be opened at an Authorized Depository).[2]

11. The UDA requires that an Authorized Depository maintain collateral in an amount not less than 115 percent of the aggregate bankruptcy funds on deposit in each bankruptcy estate that exceeds the FDIC insurance limit, unless otherwise ordered by the bankruptcy court. *See* UDA at ¶ 3.[3] Merely being a stable, highly rated bank is insufficient.

12. The Debtor has the burden of establishing cause when seeking to have the Court waive the requirements of section 345(b). *See* 11 U.S.C. § 345(b); *In re Ditech Holding Corp.*, 605 B.R. 10, 22 (Bankr. S.D.N.Y. 2019) (finding that debtors that employed integrated centralized cash management system failed to establish cause to excuse them from complying with the requirements of section 345(b)).

---

[1] A copy of the Manual (vol. 7) can be found at:
https://www.justice.gov/ust/file/volume_7_banking_and_bonding.pdf/download

[2] A copy of the UST Guidelines can be found at:
 https://www.justice.gov/ust-regions-r02/file/region_2_operating_guidelines.pdf/download

[3] A copy of the Uniform Depository Agreement is available at:
https://www.justice.gov/sites/default/files/ustregions/legacy/2012/08/09/uniform_dep_agreement.pdf

**B.    The Debtors Have Not Established Cause for an Absolute Waiver of the Requirements of Section 345(b) of the Bankruptcy Code**

13.    First, the Debtor argues that the benefits of imposing the requirements of Section 345(b) and U.S. Trustee are outweighed by the cost and disruption of opening new accounts and altering Debtor's investment practice. The Debtor's argument is conclusory, and the Debtor provides no information about the costs of complying with Section 345. The costs of complying with Section 345 must be evaluated in context. *See, e.g., Ditech*, 605 B.R. at 21 (finding that the "cost" of collateralizing the debtors' accounts at Citibank (which held over $95 million dollars of the debtors' funds daily, at the negotiated monthly fee of $80,000 per month, and a total of probably less than $200,000.00, was not unduly burdensome).

14.    This conclusory argument leaves significant questions unanswered. How does the current cash management system offer better access to the funds than if the funds were in collateralized accounts? Exactly how much better does the Debtor contend is access under the current cash management system as compared one modified to include collateralized accounts? Also, even if the current cash management system offers better terms, how is the increased risk to the estate of holding almost $11.5 million in assets in a non-collateralized accounts outweighed by the allegedly more effective access to the funds in the current cash management system? The Debtor does not answer any of these questions and provide little support for why better access to funds under the current cash management system is "cause" to deviate from Section 345.

15.    The Debtor also fails to explain the alleged disruption that would result from the conversion of the Debtor's Bank Accounts into DIP accounts by Banks that are already authorized DIP depositories. Nor does the Debtor explain the disruption that would occur from converting into DIP accounts the Bank Account that only hold the tax funds.

16. Indeed, the Debtor appears to equate the conversion of any of its accounts to DIP accounts (even at Debtor's existing Banks) with a major disruption of its cash management system.

17. Notably, the Debtor has not alleged that its Banks refuse to convert the accounts to DIP accounts, or that the Debtor has requested such conversions, or that such conversions unto themselves would be unduly disruptive. The Debtor does not even move the Court for greater time to try to establish DIP accounts with their existing Banks.

18. Second, the Debtor argues that cause exists to the extent that its funds are held by Banks that are already DIP depositories or that are "well capitalized and financially stable" "highly rated financial institutions" (Debtors do not allege with any specificity the capitalization or rating of any of its Banks). (Motion at 14.) Therefore, the Debtor argues, "the estate funds at those institutions will be protected during the chapter 11 cases to the same extent as funds at the authorized depositories." (*Id.*)

19. While the Banks' S&P ratings can be relevant to the nature of the risk when considering "cause" under Section 345(b), the Code did not limit the protection of funds to a requirement that a depository be highly rated and financially stable. The Code requires that the funds be collateralized or secured by a bond if the funds exceed the FDIC insurance limit. *See* 11 U.S.C. § 345(b) It is the bonding or collateralization that protects estate funds for the benefit of creditors—not a Standard & Poors rating. Therefore, contrary to the Debtor's claim, regardless of which of its Banks hold the Debtor's funds, the funds will not be protected to the same extent as funds held in DIP accounts.

20. Third, the Debtor asserts that maintaining the Cash Management System is consistent with Section 363(c)(1) of the Bankruptcy Code. The Debtor may be correct in this assertion, but whether maintenance of the cash management system is in the ordinary course of

business and consistent with Section 363(c)(1) is irrelevant to this Court's Section 345 analysis. The Court may only grant relief from the requirements of Section 345 "for cause." 11 U.S.C. § 345.  A procedure being "ordinary course of business" pursuant to and "consistent" with Section 363(c)(1) is not "cause" under Section 345.  The Debtor cites to *In re Columbia Gas Sys.,* 136 B.R. 930 (Bankr D. Del. 1993); In re The Charter Co., 778 F.2d 617, 621 (11th Cir. 1985); and *In re Southmark Corp.*, 49 F.3d 1111 (5th Cir. 1995) for the general notion that integrated cash management systems can allow more efficient cash management. But in none of these decisions was the court asked to address issues pertaining to waiving Section 345(b) or the UST Guidelines, and therefore none of these courts authorize waiver of such requirements.

21. The pitfalls of accepting an "ordinary course" argument are obvious. Every debtor enters bankruptcy with some existing cash management system, formal or informal. Those cash management systems are by definition part of a debtor's ordinary course of business. Consequently, if maintenance of a cash management system in the ordinary course of business is "cause" for relief from Section 345, then Section 345 would be rendered meaningless.

22. This common-sense conclusion is supported by ordinary rules of statutory construction. Courts should "give effect, if possible, to every clause and word of a statute," *Duncan v. Walker*, 533 U.S. 167, 174 (2001). So that "no clause is rendered superfluous, void, or insignificant."  *Young v. UPS*, 575 U.S. 206, 226, (2015) (internal quotations and citations omitted). Accordingly, the general permission of Section 363 cannot override the more specific directives of Section 345. *Kemp v. United States*, 142 S. Ct. 1856, 1864 (2022) (stating the rule of statutory construction that the specific governs the general) *citing RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U. S. 639, 645, (2012).

23. Finally the Debtor's request is made against the background of recent, highly publicized bank failures, including the failure of Silicon Valley Bank. See FDIC website at *https://www.fdic.gov/resources/resolutions/bank-failures/failed-bank-list/silicon-valley.html*. Although depositors at that bank were ultimately made whole, a more widespread contagion of bank failures might make it impossible for the government to pay depositors above the FDIC insurance amount. In enacting Section 345, Congress determined that bankruptcy estates should not assume these risks.

24. The Debtor relies on similar course of business, expense, and disruption arguments to support its request that they be excused in from complying with all UST Guidelines as to the utilization of properly DIP labeled business forms and checks. *Motion* ¶¶38 and 47. The Court should likewise deny these requests as Debtors have presented no argument of burden different than any other Chapter 11 corporate debtor. The Debtor emphasizes the burden of replacing "pre-printed" forms. *Id.* The Debtor's argument ignores the prevalence across industries to use electronic forms and electronically generated checks for which changing formats to include the required DIP references would be of minimal cost and disruption, absent evidence from the Debtor to the contrary.

25. In sum, the Debtor's arguments for waiving the requirements of Section 345(b), and the UST Guidelines, are unsupported and conclusory, and even if true, the Debtor has still failed to carry its burden to show that its concerns outweigh the importance of ensuring that estate funds are safeguarded for the benefit of creditors. While the Court can waive the Section 345(b) requirement, it should not do so lightly, and it should certainly not do so on the current record made by the Debtor. *See In re Ditech Holding Corp.*, 605 B.R. 10, 22 ("Collateralizing the [Debtors' bank accounts] clearly ensures the safety of the funds on deposit in those accounts and,

under the facts of this case, the payment of a monthly fee to do so, does not 'handcuff' the Debtors").

## CONCLUSION

For the reasons set forth above, the Court should deny the Debtor's Cash Management Motion to the extent the Debtor seek to evade any of the requirements of 11 U.S.C. § 345(b) and the UST Guidelines, including but not limited to the requirement to open collateralized or bonded DIP accounts, and use properly labeled checks and business forms as of the Petition Date. If the Court is inclined to grant any relief sought in the Cash Management Motion, the Court should do so on a purely interim basis until other interested parties, including but not limited to an unsecured creditors committee (if appointed), have an opportunity to be heard. The U.S. Trustee reserves the right to address any other concerns he may have regarding the Cash Management Motion at the hearing on same, and requests all other relief the Court deems just and proper.

Dated:    November 14, 2025

Respectfully Submitted,
Guy A. Van Baalen,
Acting United States Trustee for Region 21

   /s/  Audrey M. Aleskovsky
Audrey M. Aleskovsky, Trial Attorney
United States Department of Justice
Office of the United States Trustee
Florida Bar No.: 0103236
400 W. Washington Street, Suite 1100
Orlando, FL 32801
Telephone No.: (407) 648-6068
Audrey.M.Aleskovsky@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing objection has been served electronically through the CM/ECF on November 14, 2025, to all parties having appeared electronically in the instant matter.

   /s/  Audrey M. Aleskovsky
Audrey M. Aleskovsky, Trial Attorney