## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION
### www.flmb.uscourts.gov

In re:

STAR ISLAND VACATION
OWNERSHIP ASSOCIATION, INC.,[1]

               Debtor.

_____/

CASE NO. 6:25-bk-07207

CHAPTER 11

SUBCHAPTER V

### DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) (A) APPROVING AUCTION AND BIDDING PROCEDURES, (B) SCHEDULING BID DEADLINES AND AN AUCTION, AND (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (II) (A) AUTHORIZING THE SALE OF ASSETS AND (B) GRANTING RELATED RELIEF

STAR ISLAND VACATION OWNERSHIP ASSOCIATION, INC. (the "Debtor" or the "Association") respectfully states the following in support of its *Motion for Entry of an Order (I) (A) Approving Auction and Bidding Procedures, (B) Scheduling Bid Deadlines and an Auction, and (C) Approving the Form and Manner of Notice Thereof, and (II) (A) Authorizing the Sale of Assets and (B) Granting Related Relief* (the "Motion").

### INTRODUCTION

1.    Debtor seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order" or the "Order"): (a) approving the proposed marketing, auction, and bidding procedures attached as Exhibit 1 to the Order (the "Bidding Procedures"), pursuant to which Debtor will solicit and select the highest or otherwise best offer for the sale or other transaction (the "Sale Transaction") of the Property (as defined below); (b) establishing certain dates, deadlines and procedures related thereto and scheduling an auction, if any, for the

---

[1] The last four digits of Debtor's tax identification number are 6210. Debtor's primary place of business is 5000 Avenue of the Stars, Kissimmee, Florida, 34746.

Sale Transaction (the "<u>Auction</u>"); (c) approving the manner of notice of any Auction and corresponding sale approval hearing (the "<u>Sale Hearing</u>") as may be necessary; and (d) granting related relief.

2.        Additionally, Debtor will seek entry of an order at the Sale Hearing (the "<u>Sale Order</u>") (a) authorizing and approving a Sale Transaction with the Successful Bidder (as defined below); and (b) authorizing and approving the sale of the Property free and clear of all interval and other interests of Association Members (as defined below), liens, claims, encumbrances, and other interests pursuant to 11 U.S.C. §§ 363(b), (f), (h), (i) and (m), to the extent set forth in an asset purchase agreement ("<u>PSA</u>") with the Successful Bidder; and (c) granting any related relief.

3.        In support of the Motion, Debtor respectfully relies upon the *Declaration of Jeannine Rodriguez in Support of Debtor's Chapter 11 Petition and Applications for First Day Relief* (the "<u>First Day Declaration</u>"; Doc. No. 14).[2]

## JURISDICTION AND VENUE

4.        The United States Bankruptcy Court for the Middle District of Florida (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference of Cases Arising Under Title 11, United States Code, and Designating Bankruptcy Judges to Conduct Jury Trials and Act as Settlement Judges*, entered October 29, 2024 by the United States District Court for the Middle District of Florida (Corrigan, C.J.). Debtor confirms its consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

[2] Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

5.      The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedures (the "<u>Bankruptcy Rules</u>"), and Rules 2002-1, 6004-1, and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida (the "<u>Local Rules</u>").

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I.      General Background

7.      On November 6, 2025 (the "<u>Petition Date</u>"), Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Case</u>").

8.      Debtor is a not-for-profit corporation organized under the laws of the State of Florida pursuant to Articles of Incorporation filed with the Secretary of State of Florida, in Official Records Book CL 2000032355, OR 1709/1761, et. seq., on January 21, 2000.

9.      The Association was formed pursuant to a Declaration of Fairfield Orlando at Star Island dated January 24, 2000, and recorded on March 3, 2000 in the Official Records Book of Osceola County Florida at CL 2000032355, OR 1709/1701; as amended by (i) the First Amendment to Declaration recorded in Official Records Book on May 25, 2001 at CL 2001068102, OR 1877/41; (ii) the Second Amendment to Declaration recorded in Official Records Book on April 1, 2003 at CL 2003054350, OR 2222/1046; (iii) the Second Amendment to Declaration (sic) recorded in Official Records Book on July 16, 2003 at CL 2003126664, OR 2293/2576; and (iv) the Third Amendment to Declaration recorded in Official Records Book on September 17, 2003 at CL 2003171947, OR 2340/919, (collectively, the "<u>Declaration of Covenants, Conditions and Restrictions</u>").

10.    The Declaration of Covenants, Conditions and Restrictions created a plan for development of a phased timeshare property and established the timeshare plan for the resort pursuant to the Florida Timeshare Act (the "Timeshare Plan"). The resort is managed, maintained and administered, in part, by the Association.

11.    The By Laws of the Association reflect that the Association was organized and exists to administer the Fairfield Orlando at Star Island, a resort located in Osceola County Florida. The original By Laws were dated January 24, 2000, and recorded on March 3, 2000 in the Official Records Book of Osceola County Florida at CL 2000032355, OR 1709/1771.  Those By Laws, as subsequently amended, are collectively referred to as the "By Laws".

12.    Pursuant to Section 3.1 of the By Laws, the Association is governed by a Board of Directors (the "Board"). The current members of the Board are: Jeannine Rodriguez, President; Melissa Colvin, Vice President; and Courtney Padula, Secretary/Vice President.

13.    Debtor is operating its business and managing its affairs as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14.    For a detailed description of Debtor and its operations, Debtor respectfully refers the Court and parties in interest to the First Day Declaration.

## II.    The Resort Property and Property Governed by Association

15.    The *Star Island Resort* is located at One Avenue of the Stars, Kissimmee, Florida and consists of 17 buildings containing more than 500 units, with resort style amenities including a pool and tennis courts (the "Resort"). The property governed by the Association is a subpart of the Resort and consists of 4 buildings within the Resort containing a total of 184 units, including 148 connecting 2-bedroom units, 18 standard 2-bedroom units, and 18 3-bedroom units and their common areas (collectively, the "Property").

16.     Through December 31, 2025, the  Property was actively operated as a timeshare community. All units within the Property are fully furnished, and each includes a full kitchen.

## III.     Ownership of the Property

17.     The Declaration of Covenants, Conditions and Restrictions established the Timeshare Plan, and provides that "Vacation Ownership Interest," synonymous with a "Timeshare Interest," means the ownership in fee simple of an undivided interest as a tenant in common with the other owners in a phase of the Property. The undivided tenant-in-common fee interest of each owner is expressed as a fractional interest, which is denoted in a number of "points" allocated to an owner out of a total of 1,891,857,000 points.

18.     The Property governed by the Association contains a total of 184 units. The Vacation Ownership Interest consists of an interest in real property expressed as a "fractional undivided tenant in common fee simple interest in a phase"[3] of the Property. Each owner receives a deeded interest in a specific phase of the Property (but not to any particular unit).

19.     Article III of the Declaration of Covenants, Conditions and Restrictions provides that each owner of a Vacation Ownership Interest shall be a member of the Association (such owners are collectively referred to herein as the "Association Members") and transfer of ownership shall terminate membership in the Association. Each owner of an annual Vacation Ownership Interest shall be entitled to one vote in the Association. Each Association Member who is the owner of a biennial Vacation Ownership Interest shall be entitled to one-half (1/2) of a vote in the Association.

---

[3] As detailed in the Declaration of Covenants, Conditions and Restrictions.

20.     Pursuant to a Special Warranty Deed dated September 10, 2025 (the "Special Warranty Deed"), Wyndham Vacation Resorts, Inc. ("WVR"), conveyed to the Association all the right, title and interest of WVR to the following real property at the Property:

Parcel Number: R11-25-28-5112-0001-0010

An undivided 6,440,000 / 420,960,000 tenant-in-common fee simple interest in the real property commonly known as Phase I of FAIRFIELD ORLANDO AT STAR ISLAND, together with all appurtenances thereto, according and subject to the Declaration of Covenants, Conditions, and Restrictions for Fairfield Orlando at Star Island as recorded in Official Records Book 1709, Page 1701 et seq., of the Public Records of Osceola County, Florida, together with any and all amendments and supplements thereto.

and

Parcel Number: R11-25-28-5112-0001-0020

An undivided 7,476,000 / 490,299,000 tenant-in-common fee simple interest in the real property commonly known as Phase II of FAIRFIELD ORLANDO AT STAR ISLAND, together with all appurtenances thereto, according and subject to the Declaration of Covenants, Conditions, and Restrictions for Fairfield Orlando at Star Island as recorded in Official Records Book 1709, Page 1701 et seq., of the Public Records of Osceola County, Florida, together with any and all amendments and supplements thereto.

and

Parcel Number: R11-25-28-5112-0001-0230

An undivided 7,476,000 / 490,299,000 tenant-in-common fee simple interest in the real property commonly known as Phase III of FAIRFIELD ORLANDO AT STAR ISLAND, together with all appurtenances thereto, according and subject to the Declaration of Covenants, Conditions, and Restrictions for Fairfield Orlando at Star Island as recorded in Official Records Book 1709, Page 1701 et seq., of the Public Records of Osceola County, Florida, together with any and all amendments and supplements thereto.

and

Parcel Number: R11-25-28-5112-0001-0250

An undivided 7,476,000 / 490,299,000 tenant-in-common fee simple interest in the real property commonly known as Phase IV of FAIRFIELD ORLANDO AT STAR ISLAND, together with all appurtenances thereto, according and subject to the Declaration of Covenants, Conditions, and Restrictions for Fairfield Orlando at

Star Island as recorded in Official Records Book 1709, Page 1701 et seq., of the Public Records of Osceola County, Florida, together with any and all amendments and supplements thereto, including, but not limited to, the "Third Amendment to the Declaration of Covenants, Conditions and Restrictions for Fairfield Orlando at Star Island" recorded on September 17, 2003 as CL No. 2003171947, and Official Records Book 2340, Page 919.

21.    The Special Warranty Deed was recorded on September 29, 2025, in the Official Records Book 6855 at Page 811 of the public records of Osceola County, Florida.

22.    The Association owns 28,868,000/1,891,857,000 tenant-in-common fee simple interest at the Property and a concomitant share of the common elements at the Property (the "Association Interest"), which comprises approximately 1.53% of the total tenant-in-common fee simple interests at the Property. The Association owns the Association Interest as a tenant-in-common with all other owners of interests in the Property.

23.    PTVO Owners Association, Inc. ("PTVO")[4] owns 896,412,500/1,891,857,000 tenant-in-common fee simple interest at the Property and a concomitant share of the common elements at the Property, which is approximately 47.38% of the total interests in the Property. WVR owns 282,740,000/1,891,857,000 tenant-in-common fee simple interest at the Property and a concomitant share of the common elements at the Property, which is approximately 14.94% of the total interests in the Property. The remaining ownership interests in the Property (683,836,500

---

[4] Upon information and belief, pursuant to the Declaration of Covenants, Conditions and Restrictions; Grant and Reservation of Easements for Club Wyndham Access Vacation Ownership Plan ("CWA"), dated January 3, 2008, as amended, supplemented or restated from time to time (the "Club Declaration"), PTVO, a non-stock, non-profit corporation duly organized and existing under the laws of the State of Delaware, and Wyndham Vacation Resorts, Inc. ("WVR") created a multi-site timeshare program known as Club Wyndham Access. Upon Information and belief, pursuant to a Declaration of Trust for CWA dated as of January 4, 2008, as amended, supplemented or restated from time to time, (the "Trust Declaration") PTVO and WVR created an irrevocable trust to hold legal title to certain real property interests in one or more resort properties ("Club Properties") that have been subjected to the Club Declaration. Upon information and belief, the Club Properties are deeded to First American Trust, a Federal Savings Bank ("First American Trust"). Upon information and belief, First American Trust is the trustee under the Trust Declaration. Upon information and belief, PTVO is the beneficiary under the Trust Declaration.

points, approximately 36.15% of the total) are owned by approximately 9,852 parties to approximately 5,413 corresponding contracts ("Interest Owners").[5]

24.    Star Island Development Corp. ("SIDC") maintains and is the owner of the pedestrian and vehicular ingress and egress through and over all passageways, corridors, lobbies, restrooms, parking lots, green areas and elevators from the entrance of the Resort and all portions of the common areas at the Resort (the "Common Areas"). SIDC also owns and maintains the following amenities: (a) 40' x 60' heated swimming pool with 3,000 sq. ft. of deck and a 12 foot adjacent spa, (b) nine standard size tennis courts, and (c) a 14,000 sq. ft. clubhouse and fitness center (the "Recreational and Support Facilities"). SIDC also provides to Debtor access to the following utilities at the Resort: (a) telephone lines, (b) electrical lines, (c) water lines, (d) sewer lines, and (e) cable TV (collectively the "Utilities" and together with the Common Areas and the Recreational and Support Facilities, the "Retained Properties").

25.    The Property is subject to that certain Declaration of Covenants, Conditions and Restriction and Grant of Easements (the "DCCR") dated July 2, 1999 and recorded by SIDC on July 21, 1999 with the Clerk of Circuit Court of Osceola County, Florida in CL 99113026 at OR 1638/2112, as amended. The DCCR gives each member of Debtor a non-exclusive grant of easement to use the Retained Properties. In exchange, each member of the Debtor is required to pay certain "Club Dues" to SIDC. In addition, the DCCR requires Debtor to pay its proportionate share of the cost and expense of maintenance of the Retained Properties based upon the number of units existing in the Resort in proportion to the number of units existing in the project at the time SIDC incurs the cost of such maintenance.

---

[5] Upon information and belief, CWA has or may offer to acquire Interest Owners' ownership interest(s) in the Property, in exchange for certain consideration; Debtor is not and will not be a party to any such transaction.

## VI.    Consent of Association Members

26.    In furtherance of the proposed sale, Debtor has sought the consent of each Association Member to the marketing and sale of such Association Member's undivided interest(s) in the Property. Specifically, on November 7, 2025, Debtor filed the *Expedited Motion for Entry of an Order: (A) Approving the Form and Manner of Notice of the Commencement of this Chapter 11 Case, (B) Approving Form of Stipulation and Consent Agreement Authorizing Marketing and Sale of Ownership Interest(s) by Debtor Pursuant to 11 U.S.C. 363(h), (C) Establishing Scope of Notice, and (D) Approving Service of Forms and Tabulation of Responses by Omni Agent Solutions, Inc.* [Doc. No. 12] (the "Motion to Approve Forms"), whereby the Debtor sought Court approval of the form (the "Member Consent") for Association Members to indicate their consent to the marketing and sale of their undivided interests in the Property, together with the marketing and sale of the undivided interests in the Property of Debtor and all other members of the Association. On November 21, 2025, the Court granted the Motion to Approve Forms [Doc. No. 43] (the "Order Approving Forms"). Debtor, through its claims and noticing agent, Omni Agent Solutions, Inc. ("Omni"), served the Member Consent on each Association Member at its last-known address by United States first class mail, thereby soliciting such Association Member's consent to the proposed sale of its undivided interest in the Property. In addition to soliciting the Member Consents, Omni is also tasked with tabulating the Member Consents so that Debtor may expeditiously and efficiently determine which Association Members that have consented to the proposed sale of the Property.

27.    Debtor intends to file one or more adversary proceedings pursuant to section 363(h) of the Bankruptcy Code seeking judgments authorizing the sale of the Property, including the Association Interest in the Property, together with the interests of all other Association Members

(each such proceeding, a "Section 363(h) Proceeding").[6] Debtor seeks authority to market the Property according to the Bidding Procedures while the Section 363(h) Proceedings are pending. As detailed below, closing of a Sale Transaction shall be subject to the entry of a final and unappealable order or judgment of this Court authorizing Debtor to sell the Association Interest jointly with the sale of the interests of all other Association Members in the Property pursuant to section 363(h) of the Bankruptcy Code.

28.    Debtor intends to file an application requesting that the Court approve Debtor's retention of Hilco Real Estate, LLC ("Hilco") as its real estate broker to market the Property for sale, subject to the conclusion of the Section 363(h) Proceedings. The terms of Hilco's engagement will be set forth in a Declaration filed contemporaneously with the filing of Hilco's retention application.

## RELIEF REQUESTED

### I.    The Bidding Procedures

29.    Debtor seeks approval of the Bidding Procedures to establish an open process for the solicitation, receipt, and evaluation of Bids (as defined below) in a fair, accessible, and expeditious manner. The Bidding Procedures contemplate that all parties executing confidentiality agreements in accordance with the Bidding Procedures will be granted access to a virtual data room in accordance with the terms thereof, which virtual data room will be populated with relevant information regarding the Property on a rolling basis throughout the sale process.

30.    Debtor seeks to sell the Property to the highest and best bidder to maximize value for the bankruptcy estate. To provide the most competitive and flexible process, Debtor seeks to

---

[6] The rights of Association Members pursuant to section 363(j) of the Bankruptcy Code will be dealt with in the Section 363(h) Proceedings and/or the subchapter V plan.

establish standardized procedures that create an open and level playing field that permits potential purchasers the flexibility to propose an acquisition of the Property, as set forth in the Bidding Procedures. The proposed sale processes and procedures will culminate with an Auction.

31.     The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties in interest and any person or entity interested in purchasing the Property (a "Potential Bidder") with the need to run an expeditious and efficient sale process.

32.     The Bidding Procedures are designed to generate the highest or otherwise best available recoveries to Debtor's stakeholders by encouraging prospective bidders to submit competitive, value-maximizing Bids. It is Debtor's intention to market the Property and solicit Bids through Hilco as its real estate broker. Hilco has extensive experience marketing properties that are in bankruptcy proceedings. Through a robust and far-reaching marketing campaign, Hilco will expose the Property to a large pool of potential buyers. Hilco's experience allows it to clearly explain the bankruptcy sales process to interested buyers and get bidders comfortable submitting market value offers under the timeframes outlined in these Bidding Procedures. This process flushes out the market of interested parties and puts them into a competitive process to maximize the value of the property.

33.     Debtor believes that the Bidding Procedures and the timeline set forth therein are in the best interests of Debtor's bankruptcy estate, will establish the extent of the market for the Property, and provide interested parties with sufficient opportunity to participate. Because the Bidding Procedures are attached as Exhibit 1 to the Order, they are not restated in their entirety herein. Generally, the Bidding Procedures establish the following, among other things:

> **Public Announcement of Auction**. Within three (3) business days after the occurrence of the Stalking Horse Deadline (defined below), Debtor shall serve on all parties, a notice setting forth (A) (i) the date, time, and link for the (a) Auction and (b) the Sale Approval Request (as defined below) process, and (ii) the deadlines and procedures for objecting to

the proposed Sale Transaction; and (B) the Bidding Procedures (the "<u>Auction Notice</u>"), and shall upload said materials into the data room for the Property. The Auction Notice shall include a general description of the Property for sale.

*See* Bid. Proc., at § III.

**Potential Bidder Requirements**. To participate in the bidding process or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a person or entity interested in purchasing the Property, which may include any Association Member in accordance with section 363(i) of the Bankruptcy Code (a "<u>Potential Bidder</u>"), must deliver or have previously delivered to Debtor the following preliminary documentation (collectively, the "<u>Preliminary Bid Documents</u>"):

> a.   an executed confidentiality agreement (a "<u>Confidentiality Agreement</u>") in form and substance acceptable to Debtor;

> b.   sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close a purchase of the Property, the adequacy of which must be acceptable to Debtor; and

> c.   a statement detailing whether the Potential Bidder is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

Debtor, in consultation with its advisors, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may proceed to conduct due diligence and submit a Bid.

*See* Bid. Proc., at § IV.

**Stalking Horse Reimbursement**. Upon entry of the Bidding Procedures Order, Debtor shall be authorized, but not obligated, in an exercise of its business judgment to (a) select a Qualified Bidder (as defined below) to act as a stalking horse bidder (a "<u>Stalking Horse Bidder</u>") in connection with the sale process for the Property and/or any ultimate Auction; and (b) in connection with any stalking horse agreement with a Stalking Horse Bidder, Debtor may seek approval from the Court for Stalking Horse reimbursement of actual and necessary due diligence expenses up to a maximum of $100,000 (the "<u>Expense Reimbursement</u>"), and if provided for under the stalking horse agreement, may further seek court approval for a reasonable "break-up" fee, calculated as a percentage of the Stalking Horse Bid, not to exceed three percent (3%) (the "<u>Break-Up Fee</u>") (the Expense Reimbursement and Break-Up Fee each are a "<u>Stalking Horse Protection</u>," and collectively are the "<u>Stalking Horse Protections</u>"); provided, that any overbid must be sufficient to satisfy any Stalking Horse Protections approved by the Court.

*See* Bid. Proc., at § V.

**Qualified Bid/Bid Qualification Requirements**. To be deemed a Qualified Bidder and be deemed eligible to participate in any Auction, a Potential Bidder must deliver to Debtor and its advisors (i) an irrevocable offer for the purchase of all of the Property (each, a "Bid"), and shall meet the following criteria, in each case, on or prior to the Bid Deadline (as defined below); or, in the event Debtor selects a Stalking Horse Bidder prior to the Stalking Horse Deadline, (ii) documentation satisfying all of the below criteria. An Association Member submitting a Bid pursuant to section 363(i) of the Bankruptcy Code (a "Section 363(i) Bid") must clearly specify in the Bid that such Association Member is exercising its rights and submitting such Bid pursuant to section 363(i).[7] The Potential Bidder must identify the Property it intends to bid upon and post the required deposit therefor as indicated below:

Purchased Property and Assumed Liabilities: Each Bid must clearly state the following: (i) the Property to be purchased; and (ii) the liabilities and obligations to be assumed by the Potential Bidder (including any executory contracts or unexpired leases to be assumed and assigned), including any debt and cure costs to be assumed. Any Bid that is a Section 363(i) Bid must clearly state that such Bid is being submitted pursuant to section 363(i) of the Bankruptcy Code.

Good Faith Deposit: Each Bid (other than a Section 363(i) Bid) must be accompanied by a cash deposit in an amount equal to five percent (5%) of the aggregate purchase price of the Bid to be held by a title company designated by Debtor (the "Good Faith Deposit"); provided, that the Good Faith Deposit may be held by a title company designated by the Potential Bidder so long as (i) such title company is acceptable to Debtor and (ii) the Potential Bidder, title company and Debtor enter into an escrow agreement in substantially the form attached to the form of purchase agreement. In the event Debtor selects a Stalking Horse Bidder, in order to be deemed a Qualified Bidder at the scheduled Auction, a Potential Bidder must post a deposit equal to five percent (5%) of the Stalking Horse Bid.

No later than two (2) business days after conclusion of the Auction, (i) the Successful Bidder and the Back-Up Bidder must adjust its Good Faith Deposit so that it equals ten percent (10%) of the aggregate purchase price specified in the Successful Bid or Back-Up Bid, as applicable, and (ii) if a Section 363(i) Bid is selected as the Successful Bid, the Successful Bidder must tender a cash deposit in an amount equal to ten percent (10%) of the aggregate purchase price of the Successful Bid to be held by a title company designated by Debtor (the "Section 363(i) Good Faith Deposit"); provided, that the Section 363(i) Good Faith Deposit may be held by a title company designated by the Successful Bidder so long as (i) such title company is acceptable to Debtor and (ii) the Successful Bidder, title company and Debtor enter into an escrow agreement in substantially the form attached to the form of purchase agreement.

---

[7] Unless otherwise stated, each Section 363(i) Bid is a Bid and an Association Member submitting a Section 363(i) Bid is subject to the same requirements as other Potential Bidders.

<u>Purchase Price</u>: Each Bid must (i) clearly set forth the purchase price to be paid for the Property and any assumption of liabilities by the Potential Bidder (the "<u>Purchase Price</u>"), and (ii) identify separately the cash and non-cash components of the Purchase Price in U.S. Dollars.

<u>Same or Better Terms; Bid Documents</u>: Each Bid must include duly executed and non-contingent, where applicable, transaction documents necessary to effectuate the transactions contemplated in the Bid (the "<u>Bid Documents</u>"). The Bid Documents shall include: (i) a redline copy of the form of purchase agreement that will be provided by Debtor that such bidder is willing to execute, which redline edits may not change material terms to the detriment of Debtor and must be on at least equivalent or better terms to the bankruptcy estate as the form purchase agreement, (ii) a schedule of contracts and leases to be assumed to the extent applicable to the Bid, (iii) any other material documents integral to such Bid, (iv) a statement from the Potential Bidder that the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or next highest or otherwise best Bid (the "<u>Back-Up Bid</u>")) until the consummation of the Sale Transaction, and (v) to the extent the Potential Bidder is utilizing a title company other than the one designated by Debtor, evidence of committed title insurance, documented to Debtor's satisfaction.

<u>No Qualified Bidder Bid Protections</u>: Unless submitted prior to the Stalking Horse Deadline (as defined below) in connection with a request to be named as the Stalking Horse Bidder, and unless specifically designated as a Stalking Horse Bidder under the Bid Procedures, a Qualified Bid must include a statement that the Bid does not entitle such bidder to any Stalking Horse Protections, including a Break-Up Fee, termination fee, Expense Reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Property.

<u>Sources of Financing</u>: A Qualified Bid must include evidence of financial wherewithal to consummate the proposed Sale Transaction set forth in its Bid with cash on hand or, to the extent that the Bid is not accompanied by such evidence, the Bid must include committed financing, documented to Debtor's satisfaction, that demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's obligations under the proposed Sale Transaction and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to Debtor.

<u>Contingencies; No Financing or Diligence Outs</u>: The Bid must not contain any contingencies as to the validity, effectiveness, or binding nature of the Bid, including, without limitation, contingencies for due diligence, inspection, title insurance or financing of any kind (including any conditions pertaining to financial

14

performance, conditions, or prospects). All diligence <u>must</u> be completed before the Bid Deadline.

<u>Identity</u>: Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the Property or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered to complete the transactions on the terms contemplated by the parties. Each Bid must also include contact information for the specific person(s) whom K&L Gates LLP or Shuker & Dorris, P.A. can contact regarding such Bid.

<u>As-Is, Where-Is</u>: Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Property in making its Bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Potential Bidder's proposed purchase agreement; and (iv) is otherwise willing to purchase the Property "as is, where is."

<u>Authorization</u>: Each Bid must contain evidence that the Potential Bidder has obtained all necessary authorizations or approvals from its shareholders, members, and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

<u>Joint Bids</u>: Debtor will be authorized to approve joint Bids in its reasonable business judgment, on a case-by-case basis, so long as a joint Bid meets the Qualified Bid requirements and the applicable bidders otherwise comply with these Bidding Procedures.

<u>Adequate Assurance of Future Performance</u>: Each Bid must (i) identify any executory contracts (the "<u>Executory Contracts</u>") and any unexpired leases (the "<u>Unexpired Leases</u>") to be assumed or assumed and assigned in connection with the proposed Sale Transaction, (ii) provide for the payment of all cure amounts (the "<u>Cure Amounts</u>") related to such Executory Contracts and Unexpired Leases by the Qualified Bidder, (iii) demonstrate that the Qualified Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code, (iv) provide the legal name of the proposed assignee (the "<u>Proposed Assignee</u>") and any guarantors, as applicable; and (v) provide documentation as necessary to establish the foregoing.

1604766733.8

Acknowledgement of Compliance with Bidding Procedures, Bidding Procedures Order, Bankruptcy Code, and Non-Bankruptcy Law: Each Bid must acknowledge its compliance in all respects with the Bidding Procedures, the Bidding Procedures Order, Bankruptcy Code and any applicable non-bankruptcy law.

No Collusion: The Potential Bidder must acknowledge in writing (i) that it has not engaged in any collusion with respect to any Bids or the Sale Transaction, specifying that it did not agree with any Potential Bidders to control price; and (ii) that it agrees not to engage in any collusion with respect to any Bids, the Auction, or the Sale Transaction. For the avoidance of doubt, this requirement does not restrict Potential Bidders from working with other Potential Bidders with Debtor's prior written consent (email shall suffice).

Good Faith Offer: The Bid must constitute a good faith, *bona fide* offer to consummate the Sale Transaction.

Irrevocable: Each Bid must state that in the event such Bid is chosen as the Back-Up Bid (as defined below), it shall remain irrevocable until Debtor and the Successful Bidder consummate the applicable Sale Transaction.

Back-Up Bid: Each Bid shall state whether the Potential Bidder will serve as a Back-Up Bidder (as defined below) if the Potential Bidder's Bid is the next highest or otherwise best bid.

Expected Closing Date: Each Bid must state the Potential Bidder's expected date of closing of the Sale Transaction, which proposed date must be consistent with the applicable closing date set forth in the sale timeline portion of the Bidding Procedures.

Time Frame for Closing: A Bid by a Potential Bidder must be reasonably likely to be consummated, if selected as the Successful Bid (as defined herein), within a time frame set forth in the Bidding Procedures or as otherwise acceptable to Debtor.

No Fees: Except for any Expense Reimbursement and/or Break-Up Fee as may be awarded by the Court to a designated Stalking Horse Bidder, each Potential Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid(s), is agreeing to disclaim any right to receive a fee analogous to a Break-Up Fee, Expense Reimbursement, termination fee, or other similar form of compensation.

For the avoidance of doubt, unless submitted prior to the Stalking Horse Deadline for consideration as a Stalking Horse Bid and conditioned upon such bid actually being accepted as a Stalking Horse Bid, each Potential Bidder by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

<u>Adherence to Bidding Procedures</u>: By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

<u>Consent to Jurisdiction</u>: Each Potential Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtor's qualification of Bids, the Auction, the Sale Transaction and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, and the closing of the Sale Transaction, as applicable; and

<u>Conditions to Closing</u>: Each Bid must identify with particularity each and every condition to closing, including the Executory Contracts and Unexpired Leases for which assumption and assignment is required.

*See* Bid. Proc., at § VI.

34. Importantly, the Bidding Procedures recognize Debtor's fiduciary obligations to maximize value, and as such, do not impair Debtor's ability to consider all Qualified Bid proposals, and preserve Debtor's right to seek Court approval to modify the Bidding Procedures in accordance with its terms as necessary or appropriate to maximize value for the bankruptcy estate.

## II. The Sale and Auction Dates and Deadlines Schedules.

35. Debtor is seeking approval of the Bidding Procedures and the following proposed timeline for the sale process (the dates set forth below, the "<u>Sale Schedule</u>") to establish a clear and open process for the solicitation, receipt, and evaluation of Bids on a timeline that allows Debtor to consummate Sale Transaction.

36. Debtor reserves and shall have the right to: (i) seek Court approval to modify the Sale Schedule; and (ii) conduct multiple Sale Transactions across one or more Auctions to maximize the value of the Property, in accordance with the Bidding Procedures.

37. Each allocated component of a Qualified Bid shall be considered a binding Bid as to the Property. Debtor reserves the right to consider and select any bid or combination of bids as to the Property that maximizes the value and benefit to the bankruptcy estate.

**Sale Schedule Summary**

| Event | Description | Deadline |
|---|---|---|
| Marketing Campaign | Hilco to commence marketing the Property. | No later than January 30, 2026. |
| Selection of Stalking Horse Bidder | Debtor shall be authorized, but not obligated, in the exercise of its business judgment, to select a Qualified Bidder to act as a Stalking Horse Bidder.<br><br>Debtor shall file a Notice of Stalking Horse Bidder with the Court within one (1) business day after executing any Stalking Horse Agreement. | January 30, 2026, at 5:00 p.m., prevailing Eastern Time (the "Stalking Horse Deadline"). |
| Initial Qualified Bid or Bidder Qualification Deadline (the "Bid Deadline") | Deadline by which all binding Qualified Bids must be received pursuant to the Bidding Procedures.<br><br>If Debtor selects a Qualified Bidder to act as a Stalking Horse Bidder, this date shall be the deadline for Bidders to submit the requisite information/documents to Debtor to be deemed a Qualified Bidder as set forth in the Bidding Procedures and submit a Bid at the Auction. | March 30, 2026, at 5:00 p.m., prevailing Eastern Time. |
| Evaluation of Qualified Bids | Absent the filing of a Notice of Stalking Horse Bidder, Debtor shall evaluate Qualified Bids and identify the Qualified Bid that is, in Debtor's business judgment, the highest or otherwise best Qualified Bid or combination of Qualified Bids for the Property (the "Starting Bid"). | April 7, 2026 (five (5) business days after Bid Deadline). |
| Auction | The date and time of the Auction, if one is needed, which will be conducted virtually via Zoom. | April 9, 2026 (seven (7) business days after Bid Deadline), at 10:00 a.m. prevailing Eastern Time. |

| Event | Description | Deadline |
|---|---|---|
| | At the conclusion of the Auction, Debtor, in the exercise of its business judgment, shall have the right to determine the highest and best bid or combination of bids and designate one or more Successful Bids. | |
| Selection of 363(i) Bid as Successful Bid | Debtor shall be authorized, but not obligated, in the exercise of its business judgment, to select a Section 363(i) Bid as a Successful Bid.<br><br>If a Section 363(i) Bid is selected as the Successful Bid, the Successful Bidder must tender the Section 363(i) Good Faith Deposit pursuant to the Bidding Procedures. | Within two (2) business days after conclusion of the Auction. |
| Notice of Successful Bidder | After selection of the Successful Bid pursuant to the Bidding Procedures, Debtor shall file on the docket a notice identifying the Successful Bidder (as defined in the Bidding Procedures) (the "Notice of Successful Bidder"), identifying the applicable Successful Bidder, Property, and key terms of the agreement. | No later than three (3) business days after the conclusion of the Auction. |
| PSA Execution | Execution of a non-contingent Purchase and Sale Agreement for the Sale Transaction that is the subject of the Successful Bid by Debtor and Successful Bidder (a "PSA"). | Within two (2) business days after conclusion of the Auction. |
| Assumption and Rejection of Executory Contracts | If applicable in the PSA or otherwise necessary, the deadline by which Debtor shall file a motion to assume or reject executory contracts and/or unexpired leases in connection with any proposed Sale Transaction. | Within seven (7) business days of the Notice of Successful Bidder, Debtor shall file a motion regarding the proposed assumption or rejection of executory contracts and unexpired leases. |

1604766733.8

| Event | Description | Deadline |
|-------|-------------|----------|
| Sale Approval Request | The deadline by which Debtor shall file and serve a notice seeking approval of the Successful Bid and authorization to proceed with the Sale Transaction (the "Sale Approval Request") that is the subject of the Successful Bid. | Within three (3) business days after the signing of the PSA. |
| Bidder Affidavit | The Successful Bidder and the Back-up Bidder shall submit an affidavit, declaration or affirmation, as applicable, that asserts such Bidder's good faith and lack of collusion with any other Bidder. | Within three (3) business days after the conclusion of the Auction. |
| Sale Objection Deadline | The deadline by which objections, if any, to the Sale Approval Request ("Sale Objections") must be filed with the Court and received by Debtor and interested parties. | At 5:00 p.m. prevailing Eastern Time on the date that is three (3) business after the filing of the Sale Approval Request. |
| Response to Sale Objections | The deadline by which responses to any Sale Objections must be filed with the Court and received by the party submitting the Sale Objection(s), Debtor, and interested parties. | At 5:00 p.m. prevailing Eastern Time on the date that is one (1) business day after the Sale Objection Deadline. |
| Sale Hearing | The hearing before the Court, if necessary, to consider approval of the Successful Bid, pursuant to which Debtor and the Successful Bidder will consummate the Sale (the "Sale Hearing"). | Subject to the Court's calendar and availability, 10:00 a.m. prevailing Eastern Time on the date that is five (5) business days after the Sale Objection Deadline, or as soon thereafter as Debtor may be heard. |
| Closing of Sale Transaction | Closing of the Sale Transaction approved by Court. | Fourteen (14) days after later of the entry of (a) the Court's entry of an order approving the Sale Transaction (the "Sale Order"), or (b) the entry of |

1604766733.8

| Event | Description | Deadline |
|---|---|---|
| | | a final and unappealable order or judgment of this Court in the Section 363(h) Proceedings authorizing Debtor to sell the Association Interest jointly with the sale of the interests of all Association Members in the Property. |

38.     The timelines contemplated in the Sale Schedule are essential to maximize value for Debtor's bankruptcy estate. Debtor believes that the relief sought by this Motion appropriately balances the need to provide all parties in interest with notice and due process, affords Debtor sufficient time to generate interest in the Property, and provides Debtor with an expeditious process commensurate with Debtor's liquidity constraints. Accordingly, Debtor believes the relief requested herein is in the best interest of Debtor's bankruptcy estate, will provide interested parties with sufficient opportunity to participate in the process, and, therefore, should be approved.

## III.    Designation of Stalking Horse Bidder

39.     Debtor requests authority to, no later than the Stalking Horse Deadline: (a) designate a bidder with an initial Qualified Bid (the "Stalking Horse Bidder") for the Property; (b) enter into a Stalking Horse Agreement with the Stalking Horse Bidder; and (c) provide the Stalking Horse Bidder with Stalking Horse Protections, where Debtor determines, in the exercise of its reasonable business judgment, that setting a floor price for the Property is in the best interest of Debtor's bankruptcy estate.

40. Having flexibility to designate a Stalking Horse Bidder for the Property will enhance Debtor's ability to maximize value of the Property, and accordingly, is in the best interests of Debtor's estate.

41. Specifically, Debtor may: (a) establish initial overbid minimum and subsequent bidding increment requirements; (b) offer the Stalking Horse Bidder a Break-Up Fee expressed as a percentage of the Stalking Horse Bid, not to exceed three percent (3%), and/or Expense Reimbursement in an amount agreed to by Debtor and consistent with market practices, subject to Court approval; and (c) provide other appropriate and customary protections to a Stalking Horse Bidder.

42. If Debtor designates a Stalking Horse Bidder with respect to the Property, Debtor shall file with the Court a notice that identifies the Stalking Horse Bidder and discloses the Stalking Horse Bid (the "Notice of Stalking Horse Bidder") as set forth in the Bidding Procedures.

43. Given Debtor's need to maximize value for creditors and Association Members through a timely and efficient marketing and sale process, the ability to designate a Stalking Horse Bidder and offer Stalking Horse Bid Protections to such bidders is justified, appropriate and essential.

**IV.    Modification of Sale Schedule and/or Sale Process.**

44. Debtor may seek Court authority to modify any of the Bidding Procedures, Auction and/or Sale processes that are the subject of this Motion.

**V.    Form and Manner of Auction Notice.**

45. The Auction for the Property, if needed, will be conducted virtually via Zoom on April 9, 2026, at 10:00 a.m. prevailing Eastern Time.

46. As soon as practicable after entry of an Order approving the Bidding Procedures, Debtor will cause the Auction Notice, as appropriate, to be served on the parties that receive notice

of this Motion and to be uploaded into the data room for the Property as well as on the website maintained by Omni in this case (the "Omni Website"). In addition, as soon as practicable after entry of said Order, Debtor will, through Hilco, prepare and implement the following comprehensive marketing and sales process for the Property, which will include:

- Print Media Advertising
- Internet & Digital Advertising
- Email Campaigns – targeted to over 20,000 active buyers
- Custom Webpage
- Custom Brochure & Offering Memorandum
- Signage
- Identified buyer/user contact lists
- Direct Mail
- Public Relations
- Prospect Management
- Virtual Due Diligence Room
- Professionally-Handled Property Showings
- Constant Communication with Interested Parties
- Real-time Analysis
- Post-Sale/Disposition Follow-up

47.     The Auction Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale Transaction, including the date, time, and place of the Auction (if any), the Bidding Procedures, and the dates and deadlines related thereto. Accordingly, Debtor requests that the form and manner of the Auction Notice be approved and no other or further notice of the Auction be required other than the notice provided for herein.

## VI.     Court Approval of Sale

48.     Within three (3) business days of the execution of a PSA as to the Property, Debtor shall file the Sale Approval Request with the Court, consisting of (A) a certification (i) identifying the Successful Bidder as the proposed Purchaser of the Property; (ii) attesting that all contingencies and conditions precedent to the closing of the Sale Transaction have been satisfied or providing the status thereof; (iii) confirming that the Successful Bid was a Qualified Bid and satisfied all of

the requirements of the Bidding Procedures approved by this Court; (iv) confirming that the proposed Sale Transaction meets all the criteria for approval under 11 U.S.C. § 363 and as otherwise set forth in the Bidding Procedures Order; and (v) memorializing Debtor's determination that the proposed purchase represents the highest and best offer received, and manifests the most advantageous sale transaction for the bankruptcy estate; and (B) a proposed form of Order approving the Sale Transaction. Said certification shall provide parties with a three (3) business day period within which to file Sale Objections and request that, in the absence of any filed objection, the Court enter an order approving the proposed sale transaction at the conclusion of the three-day objection period. The certification will further request that, in the event an objection is filed, responsive pleadings be filed by Debtor within one (1) business day after the Sale Objection Deadline and that the court schedule a hearing within the time frames set forth in the above summary chart.[8]

### VII.    Procedures Relating to Executory Contracts and Unexpired Leases.

49.    Within seven (7) business days of the filing of the Notice of the Successful Bidder and the execution of the PSA, Debtor, if necessary, shall file a motion regarding the proposed assumption or rejection of executory contracts and unexpired leases (the "Assumption/Rejection Motion") in accordance with the terms of the Successful Bid on such matters and establish a protocol for the assumption and/or rejection of executory contracts by the Successful Bidder as ultimately approved by the Court. The Assumption/Rejection Motion will provide all applicable counterparties with (i) notice of the proposed treatment of their respective executory contract(s) or unexpired lease(s); (ii) the amount to be paid, if any, to cure any existing default(s); (iii) deadlines

---

[8] For the avoidance of doubt, closing of a Sale Transaction shall be subject to the entry of a final and unappealable order or judgment of this Court, in a Section 363(h) Proceeding or otherwise, authorizing Debtor to sell the Property, including the Association Interest jointly with the sale of the interests of all other Association Members in the Property pursuant to section 363(h) of the Bankruptcy Code.

for objecting to the proposed treatment of the executory contract/unexpired lease as set forth in the Assumption/Rejection Motion; and (iv) notice of the hearing date for the resolution of any filed objections to the Assumption/Rejection Motion. Debtor anticipates that the effective date of any assumption or rejection will be synchronized with the closing of the sale transaction. The closing will occur within the time frames set forth in the above summary schedules.

## Basis for Relief

I.  **The Relief Sought in the Order Is in the Best Interests of Debtor's Estate and Should Be Approved.**

50.    "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold." John J. Jerome & Robert D. Drain, Bankruptcy Court is Newest Arena for M&A Action, N.Y.L.J., June 3, 1991; *see In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Lykes Bros. S.S. Co.*, 207 B.R. 282, 284 (Bankr. M.D. Fla. 1997) (recognizing that a fundamental principle of Chapter 11 is "the desire to maximize the value of the estate for the benefit of all creditors"). In furtherance of that goal, bidding procedures and bid protections, such as those proposed here, may be used in court-supervised asset sales because they streamline the acquisition process, "help to provide an adequate basis by which to compare offers," and maximize value. Jerome & Drain (1991) at 8, col. 4; *see In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Dura Automotive Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) (recognizing that "procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales."); *In re Dunhill Entities, L.P.*, No. 10-01342, 2010

WL 6982623, at *1 (Bankr. S.D. Ala. Apr. 13, 2010) (approving bidding procedures that are "designed to maximize the [d]ebtors' recovery on the [a]ssets"); *In re Robb & Stucky Ltd. LLLP*, No. 8:11-bk-02801-CED (Bankr. M.D. Fla. Feb 23, 2011) (same).

> In overseeing an asset sale subject to an auction process, the bankruptcy court must weigh:
>
> on the one hand, providing for an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the bankrupt estate.

*In re Fin. News Network, Inc.*, 980 F.2d 165, 166 (2d Cir. 1992). Because the bankruptcy court must perform this balancing act, "a bankruptcy judge's broad discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly followed" that "reduce the broad discretion and flexibility a bankruptcy court must necessarily have to enhance the value of the estates before it." *Id.* at 169–70; *see also In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002) (considering the following factors: "(1) any improper or bad faith motive, (2) price is fair and the negotiations or bidding occurred at arm's length, (3) adequate procedure, including proper exposure to the market and accurate and reasonable notice to all parties in interest.").

51.     Here, Debtor submits that the Bidding Procedures are a valid exercise of its business judgment, fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this Circuit, and in the best interest of its estate. Courts have consistently held that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re 160 Royal Palm, LLC*, 600 B.R. 119, 127 (S.D. Fla. 2019) (debtor has "broad discretion to determine the appropriate procedures for marketing and selling" assets of the bankruptcy estate); *Epic Aviation, LLC v. Phillips (In re Phillips)*, 2013 WL 1899611, at *10 (M.D. Fla. May 7, 2013) (quoting *In re Nuttery*

*Farm, Inc.*, 467 F. App'x 711, 712 (9th Cir. 2012)) ( "A trustee's management of the procedural details surrounding bidding and sale are 'ultimately a matter of discretion that depends upon the dynamics of the particular situation.'"); *In re Knott*, No. 6:12-BK-07764-KSJ, 2015 WL 251705, at *2 (Bankr. M.D. Fla. Jan. 20, 2015) ("Once a trustee provides . . . sound business reasons, his or her business judgment generally is entitled to a certain amount of deference"); *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [debtor] to show that a sound business purpose justifies such actions.' If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if: he has an 'articulated business justification' . . . ." (internal citations and quotations omitted)); *see Integrated Res.*, 147 B.R. at 656 (applying business judgment rule to bidding procedures and incentives and noting that "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence."). The business justification for the sale of the Property is well established in the First Day Declaration and well supported by Association Members – with more than 98% of the voting interests present at the pre-petition special membership meetings (in person or by proxy) having voted in favor of a sale of the Property in bankruptcy.  See, e.g. First Day Declaration at ¶¶ 29-31.

52.     Debtor believes that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will maximize the value of the Property for the benefit of Debtor's estate. The proposed Bidding Procedures will allow Debtor to conduct the Sale Transaction in a controlled, fair, and open fashion that will encourage participation by financially

capable bidders who can demonstrate the ability to close a Sale Transaction. In particular, the Bidding Procedures contemplate an open and public marketing process with minimum barriers to entry and provide Potential Bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed Bid. In addition, the proposed Bidding Procedures Order provides that Debtor may alter the Sale Schedule and/or run multiple Auctions as necessary, thereby preserving Debtor's ability to run a tailored, value-maximizing process for the Property.

53.     The proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings, and are consistent with other procedures previously approved in other bankruptcy cases, large and small, in the Eleventh Circuit. *See, e.g., In re Just One More Restaurant Corp.*, Case No. 9:19-bk-1947 (Bankr. M.D. Fla. Feb. 25, 2020); *In re TAM Winddown LLC*, Case No. 20-23346-PDR (Bankr. S.D. Fla. Dec. 31, 2020); *In re TLO, LLC*, Case No. 13-20853-PGH (Bankr. S.D. Fla. Oct. 24, 2013); *In re Ruden McClosky P.A.*, Case No. 11-40603-RBR (Bankr. S.D. Fla. Nov. 8, 2011); *In re Global Energies, LLC*, 10-28935-BKC-RBR (Bankr. S.D. Fla. Oct. 21, 2010); *In re Fontainebleau Las Vegas Holdings, LLC*, Case No. 09-21481-AJC (Bankr. S.D. Fla. Nov. 24, 2009).

54.     Accordingly, Debtor respectfully requests that the Court approve the Bidding Procedures as a valid exercise of Debtor's business judgment.

## II.     The Form and Manner of Notice Should Be Approved.

55.     Pursuant to Bankruptcy Rule 2002(a), Debtor is required to provide creditors with 21 days' notice of the Auction. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the deadline for filing any objections to such a sale.

56.     As soon as reasonably practicable following entry of the Bidding Procedures Order, Debtor will cause the Auction Notice to be served upon (a) the Office of the United States Trustee

for the Middle District of Florida; (b) all Association Members; (c) Debtor's 20 largest unsecured creditors; (d) the United States Attorneys' Office for the Middle District of Florida; (e) the Internal Revenue Service; (f) the U.S. Securities and Exchange Commission; (g) the Office of the Attorney General for the State of Florida; (h) the Florida Department of Revenue; (i) the Subchapter V Trustee; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. Debtor will also cause the Auction Notice to be uploaded to the Omni Website.

57.     Debtor submits that the Auction Notice constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, no further notice is necessary and Debtor requests that this Court approve the form and manner of the notice of the Auction Notice.

## III.    The Stalking Horse Bid Protections are Reasonable and Appropriate

58.     Debtor is also seeking authority, but not direction, to offer customary breakup fees to potential Stalking Horse Bidders. Specifically, Debtor proposes providing for (i) an Expense Reimbursement of actual and necessary due diligence expenses incurred by a Stalking Horse Bidder up to a maximum of $100,000; and, to the extent provided for in any stalking horse agreement or otherwise appropriate, (ii) a Break-Up Fee expressed as a percentage of the stalking horse purchase price not to exceed three percent (3%), both of which are subject to Court approval, and further provided that any overbid must be sufficient to satisfy any Expense Reimbursement and Break-Up Fee approved by the Court. The use of a stalking horse in a public auction process for dispositions pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and to facilitate a realization of that value." *Official Comm. of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, *1 n.1 (E.D. Wis. July 7, 2011). As a result, stalking horse bidders often require

29

breakup fees as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (citations omitted); *see also Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999) (recognizing that bid protections "encourage a prospective bidder to do the due diligence that is the prerequisite to any bid by assuring the prospective bidder that it will receive compensation for that undertaking if it is unsuccessful"); *In re Metaldyne Corp.,* 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("Bidder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer"). Thus, the use of breakup fees has become an established practice in chapter 11 cases. *In re TAM Winddown LLC*, Case No. 20-23346-PDR (Bankr. S.D. Fla. Dec. 31, 2020) (approving expense reimbursements for stalking horse bidder and recognizing such reimbursements as "necessary to ensure that the Stalking Horse Bidder will continue to pursue its proposed acquisition"); *In re Global Energies, LLC*, 10-28935-BKC-RBR (Bankr. S.D. Fla. Oct. 21, 2010) (approving a break-up fee).

59.     Generally, bidding protections, such as break-up fees, are a normal and, in many cases, necessary component of significant sales under the Bankruptcy Code. *See Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659-60 (S.D.N.Y. 1992) ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. . . . In fact, because the . . . corporation [has] a duty to encourage bidding, break-up fees can be *necessary* to discharge [such] duties to maximize value."). As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re TLO, LLC*, Case No. 13-20853-PGH (Bankr. S.D. Fla. Oct. 24, 2013) (approving a breakup fee and expense

reimbursement and noting that both were "fair and reasonable" and provided "a benefit to the [d]ebtor's estate and creditors."); *In re Energy Future Holdings Corp.*, 904 F.3d 298, 313 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate." (internal quotations omitted) (alterations in original)); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010). Debtor believes that the allowance of the Stalking Horse Bid Protections are in the best interests of Debtor's estate and its creditors, as a Stalking Horse Bidder, if designated, will establish a floor for further bidding that may increase the consideration given in exchange for the Property for the benefit of Debtor's estate.

60.     Bidding protections, such as those proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313-14; *In re Just One More Restaurant Corp.*, Case No. 9:19-bk-1947 (Bankr. M.D. Fla. Feb. 25, 2020) (deeming a termination fee "an actual and necessary cost of preserving the [d]ebtors' estates within the meaning of section 503(b) of the Bankruptcy Code"). Thus, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (quoting *O'Brien*, 181 F.3d at 535) (internal quotations omitted).

61.     Courts in the Eleventh Circuit and others have routinely approved break-up fees and/or expense reimbursements offered to stalking horse bidders. *See, e.g.*, *In re Fla. Extruders Int'l, Inc.*, Case No. 8:11-bk-07761 (Bankr. M.D. Fla. May 27, 2011) (approving bidding protections including a break-up fee of up to 3%); *In re Teletronics, Inc.*, Case No. 8:11-bk-12150 (Bankr. M.D. Fla. November 23, 2011) (same; break-up fee of 3% approved); *In re Ray Realty*

*Fulton, Inc.*, Case No. 1-09-41225, 2009 WL 2600760, at *1 (Bankr. E.D.N.Y. Aug. 21, 2009) (same; break-up fee of 3.5% approved); *In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (same); *In re Just One More Restaurant Corp.*, Case No. 9:19-bk-1947 (Bankr. M.D. Fla. Feb. 25, 2020) (same; break-up fee of $1,250,000 and expense reimbursement of $275,000 approved); *In re TLO, LLC*, Case No. 13-20853-PGH (Bankr. S.D. Fla. Oct. 24, 2013) (same; breakup fee and expense reimbursement of $2,500,000 approved).

62.     Debtor believes that the ability to offer the Break-Up Fee should it deem it necessary and appropriate, is in the best interests of Debtor's estate and its creditors, as the Stalking Horse Bidder will establish a floor for further bidding that may increase the consideration ultimately realized for the Property. If a Break-Up Fee is paid, it likely will be because Debtor received higher or otherwise superior Qualified Bids for the Property. In short, the proposed Break-Up Fee is fair and reasonable under the circumstances because same would constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *In re Integrated Res., Inc.*, 147 B.R. at 662 (approving a breakup fee of 1.6 percent of the proposed purchase price).

63.     Accordingly, Debtor should be granted the authority, but not direction, to offer the Break-Up Fee and Expense Reimbursement.

## IV.     The Sale is Within the Sound Business Judgment of Debtor and Should Be Approved

64.     Ample authority exists for approval of a proposed sale to a Successful Bidder. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in the Eleventh Circuit and others have

required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtor. *See, e.g.*, *In re Phillips*, 2013 WL 1899611, at \*10 (quoting *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998)) ("The Trustee is entitled to exercise 'business judgment' in deciding which bid to accept, and this business judgment is entitled to 'great judicial deference.'"); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re 160 Royal Palm, LLC*, 600 B.R. at 129 (courts will approve a debtor's proposed sale under section 363 where the debtor has used reasonable business judgment); *In re Diplomat Const., Inc.*, 481 B.R. 215, 218 (Bankr. N.D. Ga. 2012) (chapter 7) (adopting reasoning in *In re Lionel Corp.*, 722 F.2d 1063; "The business judgment test is the prevailing rubric to evaluate the proposed transaction under § 363(b)(1)").

65.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business: (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business; (b) that adequate and reasonable notice has been provided to interested persons; (c) that the debtor has obtained a fair and reasonable price; and (d) good faith. *In re 160 Royal Palm, LLC*, 600 B.R. at 129 (acknowledging that adequate and reasonable notice to interested parties, a fair and reasonable sales price, and good faith are required to satisfy the business judgment test). A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071. The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

66.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002); *Brannan v. Wells Fargo Home Mortg., Inc. (In re Brannan)*, 485 B.R. 443, 452 (Bankr. S.D. Ala. 2013) ("While it is true that the considerable discretion conferred on courts sitting in bankruptcy by § 105 is not unlimited . . . a court is well within its authority if it exercises equitable powers to enforce a specific code provision") (quoting *Rodriguez v. Countrywide Home Loans (In re Rodriguez)*, 396 B.R. 436, 457 (Bankr.S.D.Tex.2008)).

### a.     A Sound Business Purpose Exists for the Sale.

67.     Here, a sound business purpose exists for the Sale Transaction. At a special meeting of Association Members conducted on September 25, 2025, 98% of the voting interests present at the meeting voted in favor of filing a chapter 11 bankruptcy petition in order to, among other things and subject to Court approval, market and sell the entire Property, free and clear of the interests of all Association Members. Further, at the special meetings, the Association Members voted to authorize the Board to, among other things (a) suspend occupancy at the resort as of December 31, 2025, (b) suspend collection of 2026 maintenance fees and refund to Association Members any 2026 maintenance fees already received by the Association, (c) waive the funding of reserves in

the 2026 budget, and (d) immediately suspend reservations at the resort after December 31, 2025. Thus, Association Members voted overwhelmingly to pursue a sale of the Property at this time and in this forum rather than to continue to operate the Property via future payment of maintenance fees and/or special assessments.

68.     Debtor believes that the Sale Transaction will maximize the value of the Property, exposing it to the market as part of a competitive, arms' length process. Consequently, the ultimately successful bid, after being subject to a "market check" in the form of an Auction, will constitute, in Debtor's reasonable business judgment, the highest or otherwise best offer for the Property and will provide a greater recovery for the estate than any known or practicably available alternative. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . [t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

69.     Thus, Debtor submits that the Successful Bid will constitute the highest or otherwise best offer for the Property and will provide a greater recovery for Debtor's estate than would be provided by any other available alternative. As such, Debtor's determination to sell the Property through an Auction process and subsequently to enter into a purchase agreement with the Successful Bidder will be a valid and sound exercise of Debtor's business judgment. Debtor will submit evidence in connection with the Sale Approval Request to support these conclusions. Therefore, Debtor requests that the Court make a finding that the proposed sale of the Property is a proper exercise of Debtor's business judgment and is rightly authorized.

**b.     Adequate and Reasonable Notice of the Auction and Sale Will be Provided.**

70.     The Auction Notice: (a) will be served in a manner that provides parties in interest notice of the Sale Approval Request process and the date, time, and location of any Sale Hearing;

(b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the executory contracts and unexpired leases; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale Transaction. Significantly, the form and manner of the Auction Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

        c.     **The Sale and Purchase Price Will Reflect a Fair Value Transaction.**

71.     It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *4 ("The auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

72.     Prior to the Bid Deadline, Hilco will market the Property and solicit offers consistent with the Bidding Procedures, including, for example, by providing Potential Bidders with access to a data room populated with relevant information and metrics as to the Property, targeted mailing and solicitation of suitable interested parties, evaluating and considering a variety of alternative transaction structures, and otherwise assisting Debtor with all efforts to increase the aggregate transaction value. In this way, the number of Qualified Bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the purchase price will, conclusively, be deemed fair value.

        d.     **The Sale Transaction Has Been Proposed in Good Faith Without Collusion, and the Successful Bidder is a "Good-Faith Successful Bidder."**

73.    Debtor requests that the Court find the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Property. Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

74.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, if such purchaser leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made. *See, e.g.*, *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125-26 (7th Cir. 1986) (same); *TransUnion Risk & Alternative Data Solutions, Inc. v. The Best One, Inc. (In re TLFO, LLC)*, 572 B.R. 391, 434 (Bankr. S.D. Fla. 2016) (finding that the purchaser acted in good faith and was entitled to § 363(m) protections in the absence of evidence of fraud or collusion).

75.    Debtor submits that the Successful Bidder will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. *First,* as detailed above, the consideration

to be received by Debtor from a Successful Bidder will be substantial, fair, and reasonable. *Second,* any sale agreement with a Successful Bidder will presumably be the culmination of an open competitive process culminating, if necessary, in an Auction in which all parties will be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. *Third,* at the Sale Hearing, the facts will demonstrate no "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code. And, with respect to Potential Bidders, the Bidding Procedures are designed to ensure that no party can exert undue influence over the process. *Finally,* any Bid that Debtor ultimately determines to be the Successful Bid will have been evaluated and approved by Debtor and subject to the scrutiny and review of the Court as part of the Sale Hearing. Accordingly, Debtor believes that the Successful Bidder, if any, and any purchase agreement associated with a Successful Bid should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

> **e.      The Sale Transaction Should be Approved "Free and Clear" Under Section 363(f).**

76.      Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

77.      Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant Debtor's sale of the Property free and clear of all encumbrances, except with respect to any interests that may be assumed liabilities under the

applicable purchase agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *In re Flyboy Aviation Props.*, LLC, 501 B.R. 828, 834 (Bankr. N.D. Ga. 2013) ("In order to satisfy the requirements of section 363(f), only one subsection must be satisfied.") (internal citations omitted); *In re Amelia Island Co.*, No. 09-BK-09601-PMG, 2011 WL 13506141, at *4 (Bankr. M.D. Fla. Feb. 7, 2011) ("The [s]ellers may sell the [p]urchased [a]ssets free and clear of all liens because one or more of the standards set forth in § 363(f)(1)-(5) of the Bankruptcy Code has or have been satisfied."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that a sale "free and clear" may be approved provided the requirements of at least one subsection are met).

78.    Debtor submits that sale of any interest in the Property that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, less the costs and expenses of the Sale and subject to any claims and defenses Debtor may possess with respect thereto. Debtor accordingly requests authority to convey the Property to the Successful Bidder, if any, free and clear of all encumbrances, with any such encumbrances to attach to the proceeds of the Sale Transaction.

**f.    The Sale Transaction Should be Approved Under Section 363(h).**

79.    Section 363(h) of the Bankruptcy Code permits a debtor to sell both the estate's interest, as well as the interest of any co-owner in property in which the debtor had, on the petition date, an undivided interest as a tenant in common, only if:

> (1) partition in kind of such property among the estate and such co-owners is impracticable;

(2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and

(4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

11 U.S.C. § 363(h); *see also In re Palm Beach Resort & Beach Club Condo. Assoc., Inc.*, Case No. 21-15555 (Bankr. S.D. Fla. January 17, 2022) (authorizing sale of timeshare interests following entry of judgment in adversary proceeding against tenants in common pursuant to section 363(h)); *In re Sunset Point II Timeshare Condo. Assoc., Inc.*, Case No. 17-81007 (Bankr. M.D. Ala. Oct. 16, 2018) (authorizing sale of timeshare interests).

80.     Each of the elements of 11 U.S.C. § 363(h) is present and will be satisfied by way of the Member Consents and judgments/orders entered in the Section 363(h) Proceedings. Debtor intends to establish in the Section 363(h) Proceedings (by consent of Association Members or otherwise) that (i) partition of the Property among the Debtor and co-owners is impracticable given, among other things, that the Property is co-owned by nearly 1,200 parties in an interval format as a timeshare; (ii) sale of the Association Interest alone would yield significantly less to the Debtor than the sale of the undivided interests in the Property of the Debtor and all Association Members of the Association; (iii) the benefit to the estate of a sale of the Property free of the interests of co-owners outweighs the detriment, if any, to those co-owners that do not consent to the sale; and (iv) the Property is not used in the production, transmission, or distribution for sale, of electric energy or natural or synthetic gas for heat, light, or power.

   **g.     The Bidding Procedures Comply with Section 363(i).**

81.     Section 363(i) of the Bankruptcy Code provides that before the consummation of a sale of property under 11 U.S.C. § 363(h), a non-debtor co-owner of such property "may purchase

the property at the price at which such sale is to be consummated." 11 U.S.C. § 363(i).  The Bidding Procedures preserve Section 363(i) rights of non-debtor co-owners of the Property.  Each Association Member has the right to participate in the Auction, subject to the Bidding Procedures. At the Auction, an Association Member that is a Qualified Bidder may submit a Section 363(i) Bid that competes with other bids for the Property.

> **h.     Compliance with Section 363(j).**

82.     Section 363(j) of the Bankruptcy Code states that after the sale of property under 11 U.S.C. § 363(h), the debtor shall distribute to the non-debtor co-owners of such property and to the bankruptcy estate "the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of" the Association Members and the Debtor. 11 U.S.C. § 363(j). As noted above, the rights of Association Members and the Debtor pursuant to Section 363(j) of the Bankruptcy Code will be dealt with in the Section 363(h) Proceedings and/or the subchapter V plan. The Bidding Procedures do not infringe or impair Section 363(j) rights of non-debtor co-owners of the Property.

## Request of Waiver of Stay

83.     To the extent that the relief sought in the Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, Debtor seeks a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h). As explained herein, the relief requested in this Motion is immediately necessary for Debtor to be able to preserve the value of its estate.

## Reservation of Rights

84.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against Debtor, (b) a waiver of Debtor's rights to dispute any particular claim or interest on any grounds, (c) a

promise or requirement to pay any particular claim or interest, (d) an implication or admission that any particular claim or interest is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of Debtor's, or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (g) a concession by Debtor that any interests, claims, or liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the Motion are valid, and the rights of all parties are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such interests, claims, or liens. If the Court grants the relief sought herein, same is not intended and should not be construed as an admission as to the validity of any claim or a waiver of Debtor's rights to subsequently dispute such claim.

85.     Further, Debtor requests the right to alter the Bidding Procedures based upon the exigencies of a given situation. Debtor reserves the exclusive right to: (i) determine which bids are Qualified Bids; (ii) determine which Qualified Bid is the highest or otherwise best bid and which is the next highest or otherwise best bid; (iii) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with these sales procedures, or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of Debtor; and (iv) waive terms and conditions set forth herein with respect to Qualified Bids.

## No Prior Request

86.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

## Notice

87.     Debtor will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the Office of the United States Trustee for the Middle District

42

of Florida; (b) all Association Members; (c) Debtor's 20 largest unsecured creditors; (d) the United States Attorneys' Office for the Middle District of Florida; (e) the Internal Revenue Service; (f) the U.S. Securities and Exchange Commission; (g) the Office of the Attorney General for the State of Florida; (h) the Florida Department of Revenue; (i) the Subchapter V Trustee; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, Debtor respectfully requests that the Court enter an order, in substantially the form submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: January 15, 2026

Respectfully submitted,

*/s/ R Scott Shuker*
Jeffrey T. Kucera
Carly S. Everhardt
**K&L GATES LLP**
Southeast Financial Center, Suite 3900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 539-3300
Email:  jeffrey.kucera@klgates.com

- and -

Daniel M. Eliades (Admitted *pro hac vice*)
Peter J. D'Auria (Admitted *pro hac vice*)
**K&L GATES LLP**
One Newark Center, Tenth Floor
Newark, NJ 07102
Telephone: (973) 848-4000
Email:  daniel.eliades@klgates.com
           peter.dauria@klgates.com

- and -

Jonathan N. Edel (Admitted *pro hac vice*)
**K&L GATES LLP**
300 South Tryon St., Suite 1000

1604766733.8

Charlotte, NC 28202
Telephone: (704) 331-7400
Email: jon.edel@klgates.com

- and -

R. Scott Shuker
**SHUKER & DORRIS, P.A.**
121 South Orange Ave., Suite 1120
Orlando, FL 32801
Telephone:  (407) 337-2060
Email:      rshuker@shukerdorris.com

*Counsel for Debtor and Debtor-in-Possession*

1604766733.8