UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

STAR ISLAND VACATION OWNERSHIP
ASSOCIATION, INC.

_____Debtor._____/

Chapter 11 Case
Subchapter V

Case No. 6:25-bk-07207-GER

**DEBTOR'S RESPONSE TO EXPEDITED MOTION FOR RELIEF FROM BID
PROCEDURES ORDER AND FOR CORRECTIVE BIDDER DISCLOSURES
REGARDING MARKETING MATERIALS**

Debtor-in-possession Star Island Vacation Ownership Association, Inc. ("Star Island" or
the "Debtor"), respectfully submits this response (the "Response") to Star Island Development
Corp. (the "Development Corp."), The Club at Star Island, Inc. (the "Club"), and Star Island
Management Corp.'s (the "Management Corp." collectively with the Development Corp. and the
"Club", the "Movants") *Expedited Motion for Relief from Bid Procedures Order and for
Corrective Bidder Disclosures Regarding Marketing Materials* (the "Motion") [Doc. No. 107]. In
support of its Response, the Debtor states as follows:

**PRELIMINARY STATEMENT**

1.      The Movants are impermissibly attempting to insert themselves into the Debtor's
marketing and sale process to achieve their own ends. At no time has the Debtor committed to a
process that would *require* a purchaser to assume the DCCR (as defined below); instead, the
Debtor expressed its expectation that a buyer might want to do so. Movants now seek expedited
relief to litigate hypothetical issues that are unsupported by the actual facts and circumstances of
this case and sale process, and to require the Debtor to make statements that are purely intended
to chill bidding. In actuality, all of the Debtor's materials are correct and consistent with the relief
this Court has already granted.

2.     The Debtors' Bid Procedures Motion (defined below) was properly served on all interested parties, including counsel for the Movants. Movants did not object to the Bid Procedures Motion prior to or at the hearing to consider same – (which was attended by Movants' counsel). This Court entered the Bid Procedures Order (defined below) and the Debtors have undertaken significant marketing efforts since the Bid Procedures Order was entered.

3.     Movants' Motion for reconsideration is not supported by Federal Rule of Civil Procedure 60(b) as incorporated into Federal Rule of Bankruptcy Procedure 9024.  Movants cite to Section 105(a) of the Bankruptcy Code as a basis for their reconsideration Motion but cite no other Bankruptcy Code provision or caselaw supporting the proposition that Section 105(a) authorizes the relief requested in the Motion.

4.     There is simply no factual or legal support for the Motion. The Court should therefore deny the Motion.

## BACKGROUND

5.     On November 6, 2025 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

6.     Debtor is a not-for-profit corporation organized under the laws of the State of Florida pursuant to Articles of Incorporation filed with the Secretary of State of Florida, in Official Records Book CL 2000032355, OR 1709/1761, et. seq., on January 21, 2000.

4.     The Association was formed pursuant to a Declaration of Fairfield Orlando at Star Island dated January 24, 2000, and recorded on March 3, 2000 in the Official Records Book of Osceola County Florida at CL 2000032355, OR 1709/1701; as amended by (i) the First Amendment to Declaration recorded in Official Records Book on May 25, 2001 at CL 2001068102, OR 1877/41; (ii) the Second Amendment to Declaration recorded in Official Records

Book on April 1, 2003 at CL 2003054350, OR 2222/1046; (iii) the Second Amendment to Declaration (sic) recorded in Official Records Book on July 16, 2003 at CL 2003126664, OR 2293/2576; and (iv) the Third Amendment to Declaration recorded in Official Records Book on September 17, 2003 at CL 2003171947, OR 2340/919, (collectively, the "<u>Declaration of Covenants, Conditions and Restrictions</u>").

5.      The Declaration of Covenants, Conditions and Restrictions created a plan for development of a phased timeshare property and established the timeshare plan for the resort pursuant to the Florida Timeshare Act (the "<u>Timeshare Plan</u>"). The resort is managed, maintained and administered, in part, by the Association.

6.      The By Laws of the Association reflect that the Association was organized and exists to administer the Fairfield Orlando at Star Island, a resort located in Osceola County Florida. The original By Laws were dated January 24, 2000, and recorded on March 3, 2000, in the Official Records Book of Osceola County Florida at CL 2000032355, OR 1709/1771.  Those By Laws, as subsequently amended, are collectively referred to as the "<u>By Laws</u>".

7.      Debtor is operating its business and managing its affairs as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      For a detailed description of Debtor and its operations, Debtor respectfully refers the Court and parties in interest to the First Day Declaration (Doc. No. 13).

## II.     The Resort Property and Property Governed by Association

9.      The *Star Island Resort* is located at 5000 Avenue of the Stars, Kissimmee, Florida and consists of 17 buildings containing more than 500 units, with resort style amenities including a pool and tennis courts (the "<u>Resort</u>"). The property governed by the Association is a subpart of the Resort and consists of 4 buildings within the Resort containing a total of 184 units, including

148 connecting 2-bedroom units, 18 standard 2-bedroom units, and 18 3-bedroom units and their common areas (collectively, the "Property").

### III.    Ownership of the Property

10.    The Declaration of Covenants, Conditions and Restrictions established the Timeshare Plan, and provides that "Vacation Ownership Interest," synonymous with a "Timeshare Interest," means the ownership in fee simple of an undivided interest as a tenant in common with the other owners in a phase of the Property. The undivided tenant-in-common fee interest of each owner is expressed as a fractional interest, which is denoted in a number of "points" allocated to an owner out of a total of 1,891,857,000 points.

11.    The Property governed by the Association contains a total of 184 units. The Vacation Ownership Interest consists of an interest in real property expressed as a "fractional undivided tenant in common fee simple interest in a phase" of the Property. Each owner receives a deeded interest in a specific phase of the Property (but not in any particular unit).

12.    Article III of the Declaration of Covenants, Conditions and Restrictions provides that each owner of a Vacation Ownership Interest shall be a member of the Association (such owners are collectively referred to herein as the "Association Members") and transfer of ownership shall terminate membership in the Association. Each owner of an annual Vacation Ownership Interest shall be entitled to one vote in the Association. Each Association Member who is the owner of a biennial Vacation Ownership Interest shall be entitled to one-half (1/2) of a vote in the Association.

13.    Pursuant to a Special Warranty Deed dated September 10, 2025 (the "Special Warranty Deed"), Wyndham Vacation Resorts, Inc. ("WVR"), conveyed to the Association all the right, title and interest of WVR to the following real property at the Property:

Parcel Number: R11-25-28-5112-0001-0010

An undivided 6,440,000 / 420,960,000 tenant-in-common fee simple interest in the real property commonly known as Phase I of FAIRFIELD ORLANDO AT STAR ISLAND, together with all appurtenances thereto, according and subject to the Declaration of Covenants, Conditions, and Restrictions for Fairfield Orlando at Star Island as recorded in Official Records Book 1709, Page 1701 et seq., of the Public Records of Osceola County, Florida, together with any and all amendments and supplements thereto.
and
Parcel Number: R11-25-28-5112-0001-0020
An undivided 7,476,000 / 490,299,000 tenant-in-common fee simple interest in the real property commonly known as Phase II of FAIRFIELD ORLANDO AT STAR ISLAND, together with all appurtenances thereto, according and subject to the Declaration of Covenants, Conditions, and Restrictions for Fairfield Orlando at Star Island as recorded in Official Records Book 1709, Page 1701 et seq., of the Public Records of Osceola County, Florida, together with any and all amendments and supplements thereto.
and
Parcel Number: R11-25-28-5112-0001-0230
An undivided 7,476,000 / 490,299,000 tenant-in-common fee simple interest in the real property commonly known as Phase III of FAIRFIELD ORLANDO AT STAR ISLAND, together with all appurtenances thereto, according and subject to the Declaration of Covenants, Conditions, and Restrictions for Fairfield Orlando at Star Island as recorded in Official Records Book 1709, Page 1701 et seq., of the Public Records of Osceola County, Florida, together with any and all amendments and supplements thereto.
and
Parcel Number: R11-25-28-5112-0001-0250
An undivided 7,476,000 / 490,299,000 tenant-in-common fee simple interest in the real property commonly known as Phase IV of FAIRFIELD ORLANDO AT STAR ISLAND, together with all appurtenances thereto, according and subject to the Declaration of Covenants, Conditions, and Restrictions for Fairfield Orlando at Star Island as recorded in Official Records Book 1709, Page 1701 et seq., of the Public Records of Osceola County, Florida, together with any and all amendments and supplements thereto, including, but not limited to, the "Third Amendment to the Declaration of Covenants, Conditions and Restrictions for Fairfield Orlando at Star Island" recorded on September 17, 2003 as CL No. 2003171947, and Official Records Book 2340, Page 919.

1607265114.7

14.    The Special Warranty Deed was recorded on September 29, 2025, in the Official Records Book 6855 at Page 811 of the public records of Osceola County, Florida. The Property descriptions in paragraph 14 are further included in the proposed Purchase and Sale Agreement.

15.    The Association owns 28,868,000/1,891,857,000 tenant-in-common fee simple interest at the Property and a concomitant share of the common elements at the Property (the "Association Interest"), which comprises approximately 1.53% of the total tenant-in-common fee simple interests at the Property. The Association owns the Association Interest as a tenant-in-common with all other owners of interests in the Property.

16.    PTVO Owners Association, Inc. ("PTVO") owns 896,412,500/1,891,857,000 tenant-in-common fee simple interest at the Property and a concomitant share of the common elements at the Property, which is approximately 47.38% of the total interests in the Property. WVR owns 282,740,000/1,891,857,000 tenant-in-common fee simple interest at the Property and a concomitant share of the common elements at the Property, which is approximately 14.94% of the total interests in the Property. The remaining ownership interests in the Property (683,836,500 points, approximately 36.15% of the total) are owned by approximately 9,852 parties to approximately 5,413 corresponding contracts ("Interest Owners").

17.    Star Island Development Corp. ("SIDC") maintains and is the owner of the pedestrian and vehicular ingress and egress through and over all passageways, corridors, lobbies, restrooms, parking lots, green areas and elevators from the entrance of the Resort and all portions of the common areas at the Resort (the "Common Areas"). SIDC also owns and maintains the following amenities: (a) 40' x 60' heated swimming pool with 3,000 sq. ft. of deck and a 12-foot adjacent spa, (b) nine standard size tennis courts, and (c) a 14,000 sq. ft. clubhouse and fitness center (the "Recreational and Support Facilities"). SIDC also provides to Debtor access to the

following utilities at the Resort: (a) telephone lines, (b) electrical lines, (c) water lines, (d) sewer lines, and (e) cable TV (collectively the "Utilities" and together with the Common Areas and the Recreational and Support Facilities, the "Retained Properties").

**The Bid Procedures Motion and Order**

18.     The Debtor filed its *Motion for Entry of an Order (I) (A) Approving Auction and Bidding Procedures, (B) Scheduling Bid Deadlines and an Auction, and (C) Approving the Form and Manner of Notice Thereof, and (II) (A) Authorizing the Sale of Assets and (B) Granting Related Relief* (the "Bid Procedures Motion") (Doc. No. 88) on January 15, 2026.  In the Motion, Debtor requested the Court enter an order (a) approving the proposed marketing, auction, and bidding procedures attached as Exhibit 1 to the Order (the "Bidding Procedures"), pursuant to which Debtor will solicit and select the highest or otherwise best offer for the sale or other transaction of the Property; (b) establishing certain dates, deadlines and procedures related thereto and scheduling an auction, if any, for the Sale Transaction (the "Auction"); (c) approving the manner of notice of any Auction and corresponding sale approval hearing (the "Sale Hearing") as may be necessary; and (d) granting related relief.

19.     As noted in the Bid Procedures Motion, the Property is subject to that certain Declaration of Covenants, Conditions and Restriction and Grant of Easements (the "DCCR") dated July 2, 1999 and recorded by SIDC on July 21, 1999 with the Clerk of Circuit Court of Osceola County, Florida in CL 99113026 at OR 1638/2112, as amended. The DCCR gives each member of Debtor a non-exclusive grant of easement to use the Retained Properties. In exchange, each member of the Debtor is required to pay certain "Club Dues" to SIDC. In addition, the DCCR requires Debtor to pay its proportionate share of the cost and expense of maintenance of the

Retained Properties based upon the number of units existing in the Resort in proportion to the number of units existing in the project at the time SIDC incurs the cost of such maintenance.

20.     The Bid Procedures Motion and the Notice of Hearing for the Bid Procedures Motion were properly served on all parties in interest. *See* Affidavits of Service (Doc. Nos. 89 & 92).

21.     Movants did not file an objection to the Bid Procedures Motion. Furthermore, counsel for the Movants was in attendance at the Bid Procedures Motion hearing and did not lodge an objection at the hearing or otherwise note on the record that Movant's lack of objection was due to alleged statements by the Debtor. Rather, Movants counsel reserved the Movant's rights to object to the final sale order.

22.     On February 5, 2026, the Court entered its *Order Granting Motion for Entry of an Order (I) (A) Approving Auction and Bidding Procedures, (B) Scheduling Bid Deadlines and an Auction, and (C) Approving the Form and Manner of Notice Thereof, and (II) (A) Authorizing the Sale of Assets and (B) Granting Related Relief* (the "Bid Procedures Order") (Doc. No. 99). Pursuant to that Order the Debtor has undertaken various marketing efforts as further detailed below.

**Marketing Efforts**

23.     As of February 20, 2026, the Property has been placed in front of 50,000+ potential buyers.

24.     The Property is being marketed in the following print publications:

    (i)       Southeast Real Estate Business Magazine;

    (ii)      Orlando Sentinel; and

    (iii)     Miami Herald.

*See* Declaration of Jeff Azuse in Support of Debtor's Response to Expedited Motion for Relief from Bidding Procedures Order and for Corrective Bidder Disclosures Regarding Marketing Materials (the "Azuse Dec."), ¶4.

25.     The Property is being marketed in the following digital publications:

        (i)     Florida Trend – eNewsletter and website

        (ii)     Orlando Business Journal – eNewsletter

        (iii)     BisNow (Orlando) – eNewsletter

        (iv)     Tampa Bay Times – eNewsletter

        (v)     Central Florida Lifestyle Magaize – eBlast

        (vi)     Miami Hearld – Website Banner

        (vii)     Southeast Real Estate Business – eNewsletter.

*See* Azuse Dec. ¶5.

26.     The Property is also listed on two websites:

        (i)     Revere; and

        (ii)     CREXi.com.

*See* Azuse Dec. ¶6.

27.     Approximately 75 potential bidders have signed a confidentiality agreement – including 15 new potential bidders the week of February 16, 2023. *See* Azuse Dec. ¶7.

28.     The main source of information for prospective bidders is not the teaser materials, but rather the data room maintained by Hilco (the "Data Room"). Indeed, at the bottom of the Revere webpage, there is a button that reads "Access the Data Room". Potential bidders that have signed a confidentiality agreement can access a data room to do their own due diligence. Those bidders have access to a number of documents including:

- Bidding Procedures; including the proposed PSA
- Floor Plans
- Star Island VOA INCOME STATEMENT 2024-12-31
- Star Island VOA INCOME STATEMENT 2025-10-31
- 2025 Annual Tax Bill
- Brochure – Star Island
- 1999 Star Island Management Agreement
- Kissimmee, FL Resort – Star Island Nondisclosure Agreement
- Star Island – Offering Memorandum
- Star Island 2025 Expense Breakdown
- Star Island Certificate of Insurance for Wyndham Timeshare Resort Group, Inc.
- Star Island Environmental Site Assessment
- Star Island Property Condition Report
- DCCR, including amendments

*See* Azuse Dec. ¶9.[1] The Debtor is continuing to add additional documents to the Data Room.

Hilco can see which potential bidders have accessed the Data Room, and what documents they have accessed. *Id.* at 13.

26.     Movants have not executed the confidentiality agreement, and therefore have not accessed the Data Room nor any material housed in the Data Room. Had they done so, and reviewed the documents therein, this matter may have been avoided.

27.     In their Motion, Movants ask this Court to direct to the Debtor to advise all potential bidders that:

(a) *the Property is subject to recorded covenants, restrictions, and easements (including the DCCR) that bind any subsequent purchaser and establish a mandatory club structure, comprehensive use restrictions, and substantial financial obligations;*

(b) *but for the DCCR, the Property is effectively landlocked;*

(c) *the sale does not convey any portion of the broader Star Island Resort or any non-debtor amenities/common facilities;*

---

[1] The Debtor reserves its right to add additional documents to the Data Room.

(d) the Debtor does not own roads, recreational/support facilities, or key infrastructure/utilities (including cable, phone, internet, etc.) serving the Property; and

(e) such services/access /amenities (if any) are available only if provided by non- debtor parties and only subject to compliance with recorded covenants and restrictions and any required agreements which, among other things, will obligate the purchaser to pay the attendant financial obligations.

See Motion at pp 10-11.[2]

29.    The Movants so called "Mandatory Corrective Written Disclosures" are clearly intended to dissuade other parties from bidding for the Property or depress the price of other bids in order to clear the field for Movants or their affiliates to acquire the Property.

30.    The DCCR is available to all potential bidders. Those bidders can evaluate the DCCR and the impact of same on their bid.  The Debtor cannot and should not foreclose any path that might bring in the highest and best offer.

## ARGUMENT

### I.    The Issues Raised by Movants are Unripe and Premature,

31.    The Movants allege they are filing this Motion to "clarify" what is being sold to prevent confusion at the sale hearing. No such relief is necessary for three reasons.

32.    First, the Debtor has only sought authority to sell the Property. To that end, the Debtor has consistently stated that the Property is a subpart of a larger resort:

The Star Island Resort is located at [5000][3] Avenue of the Stars, Kissimmee, Florida and consists of 17 buildings containing more than 500 units, with resort style amenities including a pool and tennis courts (the "Resort"). The property governed by the Association is a subpart of the Resort and consists of 4 buildings

---

[2] Debtor takes no position in this pleading as to the terms or legal nature of the DCCR. Debtor waives no rights by choosing not to contest Movants characterization of the DCCR in this pleading, and reserves all rights and positions.
[3] The Bid Procedures Order corrected the typo in the address from One Avenue of the Stars to 5000 Avenue of the Stars.

within the Resort containing a total of 184 units, including 148 connecting 2-bedroom units, 18 standard 2-bedroom units, and 18 3-bedroom units and their common areas (collectively, the "Property").

Bid Procedures Motion, ¶15; Declaration of Jennine Rodriguez in Support of Debtor's Chapter 11 Petition and Applications for First Day Relief (Doc. No. 14), ¶11. Similarly, the Court-approved Bidding Procedures, which are in the Data Room and attached to the Bid Procedures Order, provide as follows:

> Debtor is seeking to sell all of the property governed by the Association, which includes 4 buildings containing a total of 184 units, along with their common areas, within the Star Island Resort **(but does not include the Resort)**, located at 5000 Avenue of the Stars, Kissimmee, Florida (the "Property"), free and clear of all interests of Association Members, liens, claims, interests, or other encumbrances, to the fullest extent permitted under applicable law.

*See* Bid Procedures Order, Exhibit 1, § I (emph. added); *see also* Star Island Vacation Ownership Association, Inc.'s Plan of Liquidation [D.E. 97], Sec §2.42 ("Property means the property governed by the Association which is a subpart of the Resort and consists of 4 buildings within the Resort containing a total of 184 units, including 148 connecting 2-bedroom units, 18 standard 2-bedroom units, and 18 3-bedroom units and their common areas more particularly described on Exhibit "A" attached hereto.").

33.     While the Debtor is well aware that 11 U.S.C. §363(b) permits it to "sell…other than in the ordinary course of business, *property of the estate*…" (emph. added) and the Debtor fully intends to seek relief under §363(h) (*id.* at 27) to sell the Property free and clear of the Association Members' interests (and with those Association members to receive distributions as set forth in the Plan, (Doc No. 97) the Debtor is not a co-owner of the Retained Property, and has not and will not seek to sell anything other than its interests (and the interests of the Association Members) therein. Throughout this case—from the First Day Declaration, through the Bidding Procedures Motion, the Bid Procedures Order, and the Plan—the Debtor has clearly stated that it

only seeks to sell what it has an interest in. For example, the Data Room includes the PSA which notes the Property is subject to covenants as well as the Bidding Procedures approved by the Court which note the Debtor is not selling the Retained Property. Had the Movants accessed the Data Room, they would be aware of that fact.

34.    Second, to the extent there are objections to any Sale, the Bid Procedures Order provides a mechanism for objecting to the Sale. Bid Procedures Order, ¶10. If the Movants truly believe that any of the Successful Bids purports to sell their property, they can seek relief when such property can be identified—not now, when the most the Movants can express is "concern" that is belied by the Debtor's every filing.

35.    Third, Movants' bona fides are suspect. The Movants' main motivation appears to be to lock in the Debtor from considering any offers that would be construed to sell the Property "free and clear" of, or otherwise invalidate, extinguish, modify or impair the Recorded Declarations (including the DCCR). The Debtor has a fiduciary duty to maximize the value of any sale; as a general rule, debtors strive to keep bid procedures as broad as possible in order to meet that requirement. *See Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs)*, 423 F.3d 166, 175 (2d Cir. 2005) ("As fiduciary, the debtor bears the burden of 'maximizing the value of the estate." (citations omitted)); *In re 160 Royal Palm LLC*, 600 B.R. 119 (S.D. Fla. 2019) (noting the debtor has a duty to "maximize the return to a bankruptcy estate" which usually, but not always, "does require [the] recommendation of the highest monetary bid…").

36.    The highest and best offer may or may not require a sale free and clear of the DCCR; that issue should not be litigated as a hypothetical, but only if and when it materializes as an actual controversy. This is not the Movants' first attempt to create this requirement. Despite the Movants failure to object to the Bid Procedures Motion, including the attached Bid Procedures,

the Movants attempted to have language similar to what they are requesting to be added to the Bid Procedures after the Court orally granted the Bid Procedure Motion, but prior to the Court's entry of the Bid Procedures. The Movants and the Debtor uploaded competing orders, and the language the Movants requested regarding the covenants, after consideration by the Court, was not included in the Bid Procedures Order. This Motion is an improper end run to use the advertising process to have the Court revisit its Bid Procedures Order.

37.    The Movants cite solely to 11 U.S.C. § 105 for their relief; however, section 105 does not provide the Court the ability to grant equitable relief without relying on another provision of the Bankruptcy Code. Movants likely did not cite another provision of the Bankruptcy Code because no other provision would support the relief they are requesting. As noted in *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986), section 105 "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity."). *See also Law v. Siegel*, 571 U.S. 415, 421 (2014) ("We have long held that 'whatever equitable powers remain the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy code.").

38.    Federal Rule of Civil Procedure 60(b) as incorporated into Federal Rule of Bankruptcy Procedure 9024 only prescribes a limited set of circumstances in which an order that may be reconsidered:

(1) mistake, inadvertence, surprise, or excusable neglect;
(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
(4) the judgment is void;
(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
(6) any other reason that justifies relief.

14

*See* Fed. R. Civ. P. 60(b).[4]

39.     The Movants have not and cannot claim that subsections (1) through (5) of Federal Rule of Civil Procedure 60 are applicable here to support reconsideration of the Bid Procedures Order. Similarly, Movants cannot claim they fall under the catchall in subsection (6) because "[m]otions for reconsideration which merely revisit the same issues already ruled upon by the trial court, or which advance supporting facts that were otherwise available when the issue was originally briefed, will generally not be granted." *See e.g. Alexander v. Bleau (In re Negrete)*, 183 B.R. 195 (9th Cir. BAP 1995) (denying motion for reconsideration of a fee application under Federal Rule of Civil Procedure 60(b)(6), among other subsections, where the movant supplied additional and more specific facts in his reconsideration motion that were available when movant originally prepared his fee application).

40.     In short, the Movants' concerns are hypothetical possibilities that may or may not relate to an actual Sale—but do not relate to the processes and procedures by which the Debtor may seek that Sale. Additionally, Movant's concerns are not based on any facts not available to it at the time of the hearing on the Bidding Procedures Motion. This does not require reconsideration of the Bid Procedures Order. Thus, the Court should deny the Movant's Motion.

## II.     The Documents Provided to Prospective Buyers are not Misleading

41.     As a substantive matter, the Motion also fails because the Debtor's marketing materials are not misleading.

42.     Prior to filing the Motion, the Movants never reached out to Debtor's counsel to complain about the advertising materials in question or request that Debtors' counsel revise its

---

[4] Federal Rule of Civil Procedure 60 also contains alternative grounds such as clerical mistakes and relieve improperly notified defendants;

advertising materials. Tellingly, Movants also failed to attach the allegedly misleading materials to the Motion. The Debtor believes the below material is what the Movants are referring to this website in their Motion:



43.     The Debtor is confused as to how Movants believe this information is false. It specifically states that only four of the seventeen buildings are being sold. The description of amenities is consistent with a sale that ***does not strip*** the existing covenants which is exactly what

1607265114.7

the Movants are trying to force the Debtors to do. Moreover, potential buyers do not seem particularly confused about the DCCR or club dues; they have asked for historical payment information to determine their potential future liabilities, and the Debtor has added that information to the Data Room. *See* Azuse Dec. ¶11. Simply put, it is clear that the Property is part of a larger association. Had the Movants executed the Confidentiality Agreement and reviewed the documents in the Data Room like the approximately 75 other potential bidders, it would be clear that their requested relief is not warranted. Furthermore, in addition to the documents in the data room, the covenants and easements are publicly recorded such that any buyer conducting due diligence has the ability to review them. An advertisement need not list all contingencies as requested by the Movants.

44.     Like the First-Day declaration, the Bidding Procedures Motion, the Plan, and the Bid Procedures Order, the current form of the PSA confirms that the "Star Island Resort" is a larger project than the "Property" being marketed and that the sale is not intended to convey the entire resort. A copy of the PSA that is currently located in the Data Room is attached as Exhibit 1 to this Response.

45.     The Debtor does not concede that it cannot assume or reject executory contracts during the sale or confirmation process – and the Bid Procedures clearly address executory contracts. Additionally, the Debtor notes that the additional language the Movants are seeking to have added would add hundreds of words to each ad which would significantly increase the amount of cost per ad and also likely decrease the amount of bidders for the property – bidders that otherwise would have the opportunity to review the declarations and relevant documents pertaining to the Movants as part of their due diligence.

### III.     The Cost of Reaching Out to Thousands of People is Not Warranted

46.     Additionally, the Debtor notes that the additional language the Movants are seeking to have "corrected" would add hundreds of words to each add which would significantly increase the amount of cost per add and also likely decrease the amount of bidders for the property – bidders that otherwise would have the opportunity to review the declarations and relevant documents pertaining to the Movants as part of their due diligence. Additionally, reaching out to all ad viewers makes no sense – there is no reason to notify in excess of 50,000 people who may or may not make a bid at all.

47.     Finally, the Movants' proposed language is intended to chill bidding.  Movants freely admit they are interested in purchasing the Property – and have in fact submitted offers to the Debtor. Their proposed language is overly broad and reflects their analysis and description of the DCCR; a bidder may disagree and be fully prepared to defend a contrary position. But to include the proposed language runs the risk of chilling bidding by having *the Debtor* state that any competitive bidders are at the mercy of Movants. That is incorrect.

### CONCLUSION

The Movants are impermissibly inserting themselves into the Debtor's marketing efforts. The Debtor's Sale materials are not misleading, especially taken as a whole with the full amount of information available to potential bidders. Rather than litigate over hypothetical concerns, the Debtor should be allowed to focus on its marketing efforts and achieving the best result possible for its stakeholders.  Apart from the questionable motives behind the Motion, the Motion is not supported by fact of law. Thus, the Court should deny the Motion.

**WHEREFORE**, the Debtor requests that the Court deny the Motion and order any further relief it deems necessary.

1607265114.7

Dated:  February 22, 2026

*/s/ Carly S. Everhardt*

Jeffrey T. Kucera
Florida Bar No.: 68233
Carly Everhardt
Florida Bar No.: 122053
K&L Gates LLP
Southeast Financial Center
200 South Biscayne Boulevard
Suite 3900
Miami, Florida 33131
Telephone: 305-539-3322
Facsimile: 305-358-7095
Email:
Jeffrey.kucera@klgates.com
Email:
carly.everhardt@klgates.com

1607265114.7

**EXHIBIT A**

**Proposed Form of PSA**

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "Agreement") is made and entered into as of this _____

day of, 2026 (the "Effective Date") by and between STAR ISLAND VACATION OWNERSHIP ASSOCIATION, INC. ("Seller" or "Association" or "Debtor"), and _____, a _____ ("Purchaser"). Seller and Purchaser are sometimes referred to herein individually as a "Party", and collectively as the "Parties".

**WHEREAS**, Seller is desirous of selling the property governed by the Association which is a subpart of the Star Island Resort (the "Resort") located at 5000 Avenue of the Stars, Kissimmee, Florida and consists of 4 buildings within the Resort containing a total of 184 units, including 148 connecting 2-bedroom units, 18 standard 2-bedroom units, and 18 3-bedroom units and their common areas more particularly described on **Exhibit A** attached hereto (the "Property" as defined below). The Property is operated as a timeshare resort.

**WHEREAS**, there are 184 condominium units at the Property, and each owner has ownership in fee simple of an undivided interest as a tenant in common with the other owners in a phase of the Property. The undivided tenant-in-common fee interest in each owner is expressed as a fractional interest, denoted in a number of "points" allocated to each owner out of a total of 1,891,857,000 points. Each owner received a deeded interest in a specific phase of the Property, but not an interest to any particular unit.

**WHEREAS**, all owners of condominium units are members of the Association ("Association Members").

**WHEREAS**, pursuant to a Special Warranty Deed dated September 10, 2025, International Wyndham Vacation Resorts, Inc. ("WVR"), conveyed to the Seller all the right title, interest and claim of WVR to the following real property at the Property:

*Parcel Number: R11-25-28-5112-0001-0010*

*An undivided 6,440,000 / 420,960,000 tenant-in-common fee simple interest in the real property commonly known as Phase I of FAIRFIELD ORLANDO AT STAR ISLAND, together with all appurtenances thereto, according and subject to the Declaration of Covenants, Conditions, and Restrictions for Fairfield Orlando at Star Island as recorded in Official Records Book 1709, Page 1701 et seq., of the Public Records of Osceola County, Florida, together with any and all amendments and supplements thereto.*

*and*

*Parcel Number: R11-25-28-5112-0001-0020*

*An undivided 7,476,000 / 490,299,000 tenant-in-common fee simple interest in the real property commonly known as Phase II of FAIRFIELD ORLANDO AT STAR ISLAND, together with all appurtenances thereto, according and subject to the Declaration of Covenants,*

*Conditions, and Restrictions for Fairfield Orlando at Star Island as recorded in Official Records Book 1709, Page 1701 et seq., of the Public Records of Osceola County, Florida, together with any and all amendments and supplements thereto.*

*and*

*Parcel Number: R11-25-28-5112-0001-0230*

*An undivided 7,476,000 / 490,299,000 tenant-in-common fee simple interest in the real property commonly known as Phase III of FAIRFIELD ORLANDO AT STAR ISLAND, together with all appurtenances thereto, according and subject to the Declaration of Covenants, Conditions, and Restrictions for Fairfield Orlando at Star Island as recorded in Official Records Book 1709, Page 1701 et seq., of the Public Records of Osceola County, Florida, together with any and all amendments and supplements thereto.*

*and*

*Parcel Number: R11-25-28-5112-0001-0250*

*An undivided 7,476,000 / 490,299,000 tenant-in-common fee simple interest in the real property commonly known as Phase IV of FAIRFIELD ORLANDO AT STAR ISLAND, together with all appurtenances thereto, according and subject to the Declaration of Covenants, Conditions, and Restrictions for Fairfield Orlando at Star Island as recorded in Official Records Book 1709, Page 1701 et seq., of the Public Records of Osceola County, Florida, together with any and all amendments and supplements thereto, including, but not limited to, the "Third Amendment to the Declaration of Covenants, Conditions and Restrictions for Fairfield Orlando at Star Island" recorded on September 17, 2003 as CL No. 2003171947, and Official Records Book 2340, Page 919.*

**WHEREAS**, the Special Warranty Deed was dated September 10, 2025, and recorded on September 29, 2025, in the Official Records Book 6855 at Page 811 of the public records of Osceola County, Florida.

**WHEREAS**, Seller owns 28,868,000/1,891,857,000 tenant-in-common fee simple interest at the Property and a concomitant share of the common elements at the Property (the "Association Interest"), which comprises approximately 1.53% of the total tenant-in-common fee simple interests at the Property. The Association owns the Association Interest as a tenant-in-common with all other owners of interest in the Property.

**WHEREAS**, PTVO Owners Association, Inc. ("PTVO") owns 896,412,500/1,891,857,000 tenant-in-common fee simple interest at the Property and a concomitant share of the common elements at the Property, which is approximately 47.38% of the total interests in the Property. WVR owns 282,740,000/1,891,857,000 tenant-in-common fee simple interest at the Property and a concomitant share of the common elements at the Property, which is approximately 14.94% of the total interests in the Property. The remaining ownership interests in the Property (683,836,500 points, approximately 36.15% of the total) are owned by approximately 9,852 parties to approximately 5,413 corresponding contracts ("Interest Owners"), with each interval having its own separate corresponding contract.

2

**WHEREAS**, PTVO, WVR, and Interest Owners are all Association Members.

**WHEREAS,** on November 6, 2025, Seller filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida ("Bankruptcy Court"), which is administered under Case Number 6:25-bk-07207 ("Bankruptcy Case"). The Debtor in the Bankruptcy Case is the Seller.

**WHEREAS,** on January 15, 2026, the Debtor filed a *Motion for Entry of an Order (I) (A) Approving Auction and Bidding Procedures, (B) Scheduling Bid Deadlines and an Auction, (C) Approving the Form and Manner of Notice Thereof, and (II) (A) Authorizing Sale of Assets and (B) Granting Related Relief* (the "Sale Procedures Motion"). The Sale Procedures Motion was granted by Bankruptcy Court order dated [_____] (the "Sale Procedures Order").

[**WHEREAS,** pursuant to the Sale Procedures Order, on [_____], the Bankruptcy Court entered the Sale Order.]

[**WHEREAS**, on [_____], the Debtor filed [one or more adversary proceedings] pursuant to section 363(h) of the Bankruptcy Code, pursuant to which the Debtor is seeking a judgment authorizing the sale of all right, title and interest of the Seller and all other Association Members in the Property (each, a "Section 363(h) Proceeding").]

[**WHEREAS,** on [_____], the Bankruptcy Court entered its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Combined First Amended Disclosure Statement and (II) Confirming the First Amended Plan of Reorganization and/or Liquidation of the Debtors.* Bankruptcy Case ECF No. ___ (the "Confirmation Order").]

[**WHEREAS**, on [_____], the effective date of the Plan occurred, and the Plan was substantially consummated.]

[**WHEREAS**, Purchaser is the "Successful Bidder" (as such term is defined in the Sale Procedures Motion), and accordingly, Seller desires to sell the Property (defined below) to Purchaser, and Purchaser desires to purchase the Property from Seller, on the terms set forth in this Agreement, in accordance with and pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code").]

**NOW, THEREFORE**, in consideration of the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions. In addition to the terms defined elsewhere in this Agreement, the following terms when used in this Agreement shall have the meanings set forth in this Section 1.1. Any capitalized term in the Agreement that is not defined herein shall have the meaning ascribed to it in the Plan.

"Affiliate" means, with respect to the Person in question, any other Person that, directly or indirectly, (i) owns or controls fifty percent (50%) or more of the outstanding voting and/or equity interests of such Person, or (ii) controls, is controlled by or is under common control with, the Person in question. For the purposes of this definition, the term "control" and its derivations means having the power, directly or indirectly, to direct the management, policies or general conduct of business of the Person in question, whether by the ownership of voting securities, contract or otherwise.

"Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other Applicable Law addressing or in any way relating to terrorist acts and acts of war.

"Applicable Law" means (i) all federal, state, and local statutes, laws, common law, rules, regulations, ordinances, codes or other legal requirements of any Governmental Authority, stock exchange, board of fire underwriters and similar quasi-governmental authority, and (ii) any judgment, injunction, order or other similar requirement of any court or other adjudicatory authority, in effect at the time in question and in each case to the extent the Person or property in question is subject to the same.

"Assumed Liabilities" has the meaning set forth in Section 2.4 hereof.

"Business Day(s)" shall mean every day other than (i) Saturdays, (ii) Sundays, (iii) all days observed by the Federal Government of the United States as legal holidays and (iv) all days on which commercial banks in New York State are required by law to be closed.

"Casualty" has the meaning set forth in Section 13.1 hereof.

"Closing" has the meaning set forth in Section 10.1 hereof.

"Closing Date" has the meaning set forth in Section 10.1 hereof.

"Closing Statement" means a closing statement prepared by the Title Company in connection with Closing.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any regulations, rulings and guidance issued by the Internal Revenue Service.

"Condemnation" has the meaning set forth in Section 13.2 hereof.

"Contracts" means, collectively, the Leases and Executory Contracts and any written or oral note, bond, mortgage, contract, license, lease, sublease, covenant, commitment, power of attorney, proxy, indenture, or other binding agreement or arrangement.

"Confirmation Order" means the Order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

4

"Cure Amounts" or "Cure Costs" mean the aggregate monetary sum required to be paid to the counterparties under the Purchased Contracts to be assigned by the Seller and assumed by Purchaser in accordance with Section 2 hereof.

"Deeds" has the meaning set forth in Section 10.2.1(a) hereof.

"Earnest Money" means, at the time in question, the amounts then deposited with Escrow Agent (and any additional amounts as may be deposited with Escrow Agent), together with all interest and any other amounts earned thereon.

"Earnest Money Escrow Agreement" has the meaning set forth in Section 3.2.1 hereof.

"Environmental Claims" means all claims for reimbursement, remediation, abatement, removal, clean up, contribution, personal injury, property damage or damage to natural resources made by any Governmental Authority or other Person arising from or in connection with the (i) presence or actual or potential spill, leak, emission, discharge or release of any Hazardous Substances over, on, in, under or from the Property, or (ii) violation of any Environmental Laws with respect to the Property.

"Environmental Laws" means any Applicable Laws which regulate the manufacture, generation, formulation, processing, use, treatment, handling, storage, disposal, distribution or transportation, or an actual or potential spill, leak, emission, discharge or release of any Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other environmental media, including, without limitation, (a) the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. §§ 9601 et seq.) ("CERCLA"); (b) the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.) ("RCRA"); (c) the National Environmental Policy Act (42 U.S.C. §§ 4321 et seq. (1969), as amended); (d) the Emergency Planning and Community Right to Know Act (42 U.S.C. §§ 11001 et seq.); (e) the Clean Air Act (42 U.S.C. §§ 7401 et seq.); (f) the Clean Water Act (33 U.S.C. §§ 1251 et seq.); (g) the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.); (h) the Hazardous Materials Transportation Act (49 U.S.C. §§ 5101 et seq.); (i) any state, county, municipal or local Applicable Laws similar or analogous to the federal statutes listed in parts (a)-(h) of this definition; and (j) any rules, regulations, directives, or orders pursuant to or implementing the Applicable Laws listed in parts (a)-(i) of this definition.

"Escrow Agent" means _____

"Executory Contract Order" means a Final Order determining the Assumption/Rejection Motion as defined below.

"Executory Contract" means any existing executory contract or unexpired lease of personal property between any Seller and any other Person or Persons regarding the Property.

"Final Order" means an Order of the Bankruptcy Court or a court of competent jurisdiction to hear appeals from the Bankruptcy Court that has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari or move for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for re-argument or rehearing shall then be pending; provided, however, that the possibility that a

motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

"Governmental Authority" means any federal, state or local government or other political subdivision thereof, including, without limitation, any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or property in question. For the avoidance of doubt, Governmental Authority shall include all Taxing Authorities.

"Hazardous Substances" means all substances, chemicals, wastes, materials, pollutants, or contaminants defined as Hazardous Substances, Oils, Pollutants or Contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.5, or defined as hazardous or toxic by, or regulated as such under, any applicable Environmental Law, including RCRA hazardous wastes, CERCLA hazardous substances, asbestos, toxic mold, and polychlorinated biphenyls.

"Land" has the meaning set forth in Section 2.1.1 hereof.

"Lease" means any lease, master lease, sublease or sub-sublease, letting, license, sublicense or sub-sublicense, concession, or other agreement (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy, all or any portion of the Property, and every modification, amendment, or other agreement (whether written or oral) relating to such lease, license, or other agreement entered into in connection with such lease, license, or other agreement, whether in existence before or after the Petition Date. A list of "Unexpired Leases" is attached at **Exhibit B** hereto.

"Liabilities" means any liability, obligation, damage, loss, diminution in value, cost or expense of any kind or nature whatsoever, whether accrued or unaccrued, actual or contingent, known or unknown, foreseen or unforeseen.

"Lien" means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind, including any "lien" as defined in Section 101(37) of the Bankruptcy Code, or a conditional sale contract, title retention contract or other contract to give any of the foregoing.

"Material Casualty" has the meaning set forth in Section 13.1.1 hereof.

"Material Condemnation" has the meaning set forth in Section 13.2.1 hereof.

"Order" means an order or judgment entered in the Bankruptcy Case by the Bankruptcy Court as entered on the Docket as well as any writ, judgment, decree, award, ruling, subpoena, verdict, injunction or similar order of any Governmental Authority (in each such case whether preliminary or final).

"Permitted Exceptions" has the meaning set forth in Section 5.3 hereof.

6

"<u>Person</u>" means any natural person, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a representative capacity.

"<u>Petition Date</u>" means <u>November 6, 2025</u>, the date upon which the Debtor filed a petition commencing the Bankruptcy Case.

"<u>Plan</u>" means the chapter 11 plan of reorganization of the Debtors to be filed in the Chapter 11 cases, in form and substance consistent in all material respects with this Agreement, as such plan may be modified from time to time.

"<u>Property</u>" has the meaning set forth in Section 2.1 hereof.

"<u>Prorations</u>" has the meaning set forth in Section 11.1 hereof.

"<u>Retained Liabilities</u>" has the meaning set forth in Section 2.5 hereof.

"<u>Release</u>" means any release, spill, emission, discharge, leaking, leaching, pumping, pouring, dumping, emptying, injection, deposit, disposal of or migration into or through the indoor or outdoor environmental medium or into or out of any property.

"<u>Rejected Contract(s)</u>" means those Executory Contracts and Leases which are rejected by the Debtor pursuant to Section 365 of the Bankruptcy Code.

"<u>Rejection Claim</u>" means any claim under the Bankruptcy Code that arises in favor of the third party to any Executory Contract or Lease that is a Rejected Contract.

"<u>Sale Order</u>" shall mean the Final Order of the Bankruptcy Court, substantially similar to the form of Sale Order attached at **Exhibit C** hereto, approving the sale of the Property free and clear of all liens, encumbrances and claims other than the Permitted Exceptions.

"<u>Section 363(h) Proceeding</u>" shall have the meaning set forth in the recitals hereto.

"<u>Taxes</u>" means any federal, state, local or foreign, real property, personal property, sales, use, room, occupancy, ad valorem (real or personal property) or similar taxes, assessments, levies, charges or fees imposed by any Governmental Authority on Seller with respect to the Property, including any assessment, interest, penalty or fine with respect thereto, but expressly excluding any (i) federal, state, local or foreign income, capital gain, gross receipts, capital stock, franchise, profits, estate, gift or generation skipping tax or (ii) transfer, documentary stamp, recording or similar tax, levy, charge or fee incurred with respect to the transaction described in this Agreement.

"<u>Tenant</u>" means a Person counterparty to a Lease entered into with the Seller.

"<u>Title Commitments</u>" has the meaning set forth in Section 5.1 hereof.

"<u>Title Company</u>" means _____

"<u>Unpermitted Exceptions</u>" has the meaning set forth in Section 5.3 hereof.

**1.2**     Unless the context clearly indicates to the contrary, the following rules shall apply to the construction of this Agreement:

1.2.1.   All references herein to articles or sections without reference to a specific document are references to articles or sections of this Agreement.

1.2.2.   The terms "hereby", "hereof", "hereto", "herein", "hereunder" and any similar terms, as used in this Agreement, refer to this Agreement in its entirety and not the article or section of this Agreement in which they appear.

1.2.3.   The word "including" means "including but not limited to."

1.2.4.   All Recitals and Exhibits to this Agreement, including any amendments and supplements hereto, are hereby incorporated herein and made a part of this Agreement.

## ARTICLE II
## THE PROPERTY AND LIABILITIES

**2.1**     <u>Description of the Property</u>. Subject to the terms set forth in this Agreement, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Seller, all right, title and interest of Seller and all other Association Members in and to the property and assets set forth in this Section 2.1 (collectively, the "<u>Property</u>"):

2.1.1.   All of the fee simple interest in, to and under the land of _____, described in **<u>Exhibit A</u>** attached hereto, (collectively, the "<u>Land</u>");

2.1.2.   All right, title and interest in, to and under all privileges and easements appurtenant to the Land, including, without limitation, right, title and interest of Seller and all other Association Members in, on and under the Land, all easements, rights of way or other appurtenances of Seller used in connection with the beneficial use and enjoyment of the Land and all assignable permits, licenses, approvals and authorizations issued by any Governmental Authority (collectively, the "<u>Appurtenances</u>");

2.1.3.   All right, title and interest in and to all improvements and fixtures located on the Land, including, without limitation, all buildings and structures located on the Land (collectively, the "<u>Improvements</u>");

2.1.4.   Subject to the provisions of Section 2.2 hereof, all right, title and interest of Seller and all other Association Members in and to the Executory Contracts and Unexpired Leases identified on **<u>Schedule 1</u>** and **<u>Schedule 2</u>**, respectively, attached hereto; and

2.1.5.   Subject to the provisions of Section 2.2 hereof, all leases and purchase money security agreements for any equipment, machinery, vehicles, furniture or other personal property located at the Property, together with all deposits made thereunder, to the extent the same and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (collectively, the "<u>Equipment Leases</u>") each of which are referenced on **<u>Schedule 3</u>** attached hereto.

8

**2.2**    Executory Contracts and Unexpired Leases.

2.2.1.  Purchaser herby designates the Executory Contracts, Unexpired Leases, and Equipment Leases identified on **Schedule 1, Schedule 2** and **Schedule 3** attached hereto as "Purchased Contracts" under this Agreement. Any Executory Contracts, Unexpired Leases, and Equipment Leases that are not identified on **Schedule 1, Schedule 2** or **Schedule 3** attached hereto shall be deemed an "Excluded Contract" under this Agreement. Any Excluded Contract may be assumed or rejected by Seller in its sole discretion.

2.2.2.  Within seven (7) Business Days after the execution of this Agreement, the Seller shall file a motion with the Bankruptcy Court regarding the proposed assumption or rejection of Purchase Contracts and Excluded Contracts (the "Assumption/Rejection Motion"). The Assumption/Rejection Motion shall provide all applicable counterparties with (i) notice of the proposed treatment of their respective executory contract(s) or unexpired lease(s); (ii) the amount to be paid, if any, to cure any existing default(s) – the Cure Costs; (iii) establishing deadlines for objection to the proposed treatment of the executory contract and/or unexpired lease as set forth in the Assumption/Rejection Motion, including payment of the Cure Costs; and (iv) establishing a hearing date for the resolution of any filed objections to the Assumption/Rejection Motion.

2.2.3.  Subject to entry of a Final Order on the Assumption/Rejection Motion, on the Closing Date, the Purchased Contracts shall be deemed assumed by the Seller and assigned to Purchaser pursuant to Sections 365(b)(l)(A) and (B) and 365(f) of the Bankruptcy Code. In addition to the Purchase Price, Purchaser shall assume all obligations and Liabilities under the Purchased Contracts, including any Cure Amounts allowed by Final Order. For the avoidance of doubt, after the Closing, Seller shall not be responsible for compliance with any Purchased Contract and shall not be responsible for any costs associated therewith. If there are any costs or fees associated with the assignment of a Purchased Contract to Purchaser, Purchaser shall be responsible for payment of all such costs and fees. All Cure Costs shall be the responsibility of Purchaser, in addition to the Purchase Price, and payment of Cure Costs shall not be credited against or deducted from the Purchase Price.

2.2.4.  Purchaser shall have no Liabilities for any Cure Costs or Rejection Claim of a counterparty to an Excluded Contract.

2.2.5.  Notwithstanding the foregoing, so long as an Excluded Contract has not been rejected by the Seller pursuant to Section 365 of the Bankruptcy Code and Final Order of the Bankruptcy Court, Seller shall, upon written request by Purchaser, seek to assign such Excluded Contract to Purchaser, and Purchaser shall assume the same in accordance with Sections 2.2 hereof.

**2.3**    Cure Costs. Subject to the entry of a Final Order on the Assumption/Rejection Motion, Cure Costs shall be paid at the Closing (or in the case of a dispute, the disputed amount shall be escrowed at the Closing with the Escrow Agent pursuant to an escrow arrangement reasonably acceptable to Seller and Purchaser).

**2.4**    Assumed Liabilities. At the Closing, Purchaser shall assume all Liabilities to the extent arising or occurring from and after the Closing Date with respect to the Property and the Purchased

Contracts, but expressly excluding the Retained Liabilities (all Liabilities, except for the Retained Liabilities, shall be referred to herein as "Assumed Liabilities").

**2.5**    Retained Liabilities. At the Closing, Seller shall retain all Liabilities to the extent arising or occurring prior to the Closing Date with respect to the Property, the Purchased Contracts or the Excluded Contracts (the "Retained Liabilities").

**2.6**    Survival. The Parties rights and obligations under this Article II shall survive the Closing Date.

**ARTICLE III**
**PURCHASE PRICE**

**3.1**    Purchase Price. The purchase price for the Property is _____ and 00/100 Dollars ($_____) (the "Purchase Price"), as adjusted by the prorations and adjustments provided elsewhere in this Agreement.

**3.2**    Earnest Money.

3.2.1.    Earnest Money Deposit. Prior to the Effective Date, Purchaser shall deposit with Escrow Agent the sum which is equal to ten percent (10%) of the Purchase Price (the "Earnest Money Deposit"). The Earnest Money Deposit shall be held by Escrow Agent in escrow as earnest money pursuant to the escrow agreement in the form attached hereto as **Exhibit D**, entered into among Seller, Purchaser and Escrow Agent (the "Earnest Money Escrow Agreement"). The Earnest Money Deposit shall be maintained by the Escrow Agent to comply with the requirements of the Bankruptcy Court and the Sale Procedures Order. Except as specifically set forth in this Agreement, the Earnest Money Deposit shall be nonrefundable to Purchaser.

3.2.2.    Disbursement of Earnest Money. At the Closing, the Earnest Money Deposit shall be applied to the Purchase Price. If this Agreement is terminated for any reason and Purchaser is not entitled to a refund of the Earnest Money Deposit pursuant to the express provisions of this Agreement, the Earnest Money Deposit shall be disbursed in accordance with the provisions of the Escrow Agreement and/or other applicable Order. This Section 3.2.2 shall survive the termination of this Agreement.

**3.3**    Payment of Purchase Price. At the Closing, Purchaser shall deposit with Escrow Agent, in immediately available funds, an amount equal to the Purchase Price as adjusted by the prorations and adjustments provided elsewhere in this Agreement and less the Earnest Money Deposit.

**3.4**    Disbursement of Earnest Money and Purchase Price. The Purchase Price, inclusive of the Earnest Money Deposit, shall be distributed by the Escrow Agent in accordance with the provisions of the Sale Order and/or other applicable Order.

**3.5**    Like-Kind Exchange.

Notwithstanding anything to the contrary in this Agreement, each Party acknowledges and agrees that the other Party or Parties (as the case may be) has the right to designate this transaction to qualify as a tax-free exchange under Section 1031 of the Code, and that Purchaser shall have

10

the right to assign this Agreement to a "qualified intermediary" (as defined in Treas. Reg. § 1.1031(k)-1(g)(4) of the Code) or such other entity or entities as is necessary to carry out a 1031 Exchange. Each Party shall execute and deliver such documents as may reasonably and customarily be required to complete the transactions contemplated by any such tax-free exchange, which are in form and substance reasonably acceptable to the other applicable Parties, and otherwise cooperate in all reasonable respects with respect to such tax-free exchange, provided that (i) Seller shall not be required to take title to any property, and (ii) neither such tax-free exchange nor Seller's cooperation therewith shall result in any delay to the Closing, nor the imposition of any cost or liability upon Seller or Purchaser, as the case may be.

## ARTICLE IV
## CONTINGENCIES

**4.1**    No Contingencies. Purchaser acknowledges and agrees that Purchaser has completed all of its due diligence investigations with respect to the Property and is satisfied with the same. For the avoidance of doubt, it is expressly understood and agreed to by Purchaser that there is no due diligence or financing contingency, or other contingency under this Agreement, which gives Purchaser a right of termination. Purchaser's only termination rights are set forth in Sections 5.3, 5.4, 9.1.2, 9.2.2, 12.1, 13.1.1, 13.2.1 hereof.

## ARTICLE V
## TITLE TO THE PROPERTY

**5.1**    Title Commitments. On the Effective Date of this Agreement, Purchaser shall have obtained at Purchaser's sole cost and expense, a commitment for an owner's title insurance policy (or policies, as the case may be) from the Title Company for the Property (collectively, the "Title Commitment").[1]

**5.2**    Exceptions to Title. Except as provided in this Agreement or otherwise accepted by Purchaser in writing, the sale of the Property to Purchaser hereunder shall be subject to the Permitted Exceptions defined below but otherwise free and clear of any interest or liens in accordance with the Plan and Confirmation Order.

**5.3**    Permitted Exceptions and Unpermitted Exceptions. Within five (5) days of the Effective Date, Purchaser shall give written notice to Seller (the "Exception Notice") of all of Purchaser's exceptions to title which Purchaser is unwilling to take title subject to (the "Unpermitted Exceptions"). Any exception to title not raised as an Unpermitted Exception shall be deemed permitted (the "Permitted Exceptions"). Other than Permitted Exceptions, Seller shall notify Purchaser within seven (7) Business Days after receipt of the Exception Notice whether it will cure the matters set forth therein which Purchaser has indicated it is unwilling to accept title subject to. If Seller notifies Purchaser that Seller will not cure all such other matters, then, within five (5) Business Days thereafter, Purchaser shall, by notice to Seller either (i) elect to terminate this Agreement or (ii) accept such matters as Permitted Exceptions; and, if Purchaser does not notify

---

[1] If Purchaser chooses to utilize a title company other than the designated Title Company, then Purchaser shall have waived its rights to the provisions on this Article and shall have no right to terminate this Agreement pursuant to Article V.

Seller that it has elected to accept such matters, Purchaser shall be deemed to have elected to accept title subject to such matters without any reduction to the Purchase Price. Purchaser shall cause copies of all updates and/or continuations of the Title Commitments to concurrently be delivered to Seller's attorneys. Purchaser acknowledges and agrees that Purchaser shall be obligated to take title to the Property and complete the Closing subject to all Permitted Exceptions.

**5.4**     Failure to Cure. Seller shall have until the Closing Date (as the same may be adjourned, extended, or postponed by Seller or Purchaser pursuant to the terms hereof) to cure any Unpermitted Exceptions. In the event that Seller shall be unable to deliver title as required under this Article V, including without limitation, the curing of any Unpermitted Exceptions, Purchaser's sole and exclusive right shall be either to (i) terminate this Agreement, in which case the Earnest Money Deposit shall be refunded to Purchaser and the Parties shall have no further recourse, rights or obligations under this Agreement, except those which expressly survive such termination, or (ii) proceed to Closing pursuant to this Agreement and accept title to the Property subject to the Unpermitted Exceptions, which thereafter shall be deemed to constitute Permitted Exceptions without offset or deduction from the Purchase Price. Notwithstanding anything to the contrary set forth in this Agreement, Seller shall have the right extend the Closing Date for a period of up to sixty (60) days in order to effect the cure of any Unpermitted Exceptions.

**5.5**     Conveyance of the Property. At the Closing, Seller shall convey insurable fee simple title (as determined by the Title Company) to the Property, subject to all Permitted Exceptions and otherwise in accordance with the terms of the Plan, Sale Order and/or other applicable Order.

## ARTICLE VI
## CONDITION OF THE PROPERTY

**6.1**     Remediation Activities and Permits.

6.1.1.   Current Regulatory Status of Property.  A summary of the regulatory history and environmental condition of the Property is set forth in the informational documents listed in **Exhibit E**, which Purchaser acknowledges receiving from Seller or its consultants prior to the execution of this Agreement.

6.1.2.   Remediation Activities.  Purchaser shall be solely responsible at its sole cost and expense for completing any required remediation of environmental conditions at the Property which may exist as of the Closing Date and which may arise thereafter ("Remediation Activities").

**6.2**     Release and Indemnity.  By accepting Seller's deeds at the Closing, Purchaser irrevocably waives and releases, on behalf of Purchaser, Purchaser's agents, Purchaser's affiliates, agents, and all successors in title to the Property, any claims against Seller (and against Seller's members, managers, officers, representatives) as owner, operator or otherwise, arising out of or in connection with any conditions, including environmental and subsurface conditions, whether known or unknown, latent or apparent, and whether such claims are based on or sound in contract, tort, statute, common law liability, contribution, indemnity, strict liability or any other theory or cause of action.  Further, Purchaser shall indemnify, defend and hold Seller harmless in respect of any and all claims, proceedings, losses, damages, liabilities and expenses, whether or not due and payable, asserted against, incurred or suffered by Seller due to any environmental condition

12

alleged to have arisen after Closing or from the exacerbation after Closing of a condition of the Property that existed prior to Closing.

**6.3**  'AS-IS', 'WHERE IS' Condition. Purchaser acknowledges and agrees that (a) the purchase of the Property shall be on an "As Is", "Where Is", "With All Faults" basis, subject to wear and tear from the Effective Date until Closing Date, and (b) except as expressly set forth in this Agreement, Seller has no obligation to repair any damage to or defect in the Property, replace any of the Property or otherwise remedy any matter affecting the condition of the Property. Upon Closing, Purchaser shall assume the risk that adverse matters, including but not limited to, construction defects and adverse physical and environmental conditions, may not have been revealed by Purchaser's investigations, and Purchaser, upon Closing, except as otherwise expressly set forth in this Agreement, shall be deemed to have waived, relinquished and released Seller from and against any and all claims, demands, causes of action (including causes of action in tort), losses, damages, liabilities, costs and expenses (including attorneys' fees and court costs) of any and every kind or character, known or unknown, which Purchaser might have asserted or alleged against Seller at any time by reason of or arising out of any latent or patent construction defects or physical conditions, violations of any applicable laws (including, without limitation, any environmental laws) and any and all other acts, omissions, events, circumstances or matters regarding the Property. Seller agrees to maintain the Property in substantially the same condition as it is in as of the Effective Date of this Agreement.

**6.4**  No Reliance on Seller.  Purchaser is entering into this Agreement on the basis of Purchaser's own independent evaluation and investigation, and Purchaser does not rely on any statement or representation by Seller or any of Seller's representatives. Notwithstanding anything to the contrary, Seller is not making, and specifically disclaims, any representations, warranties or covenants of any kind or character, express or implied, with respect to the operational, environmental or physical condition of the Property, including, but not limited to, representations, warranties or covenants as to: (a) matters of title, zoning, permitted uses, tax consequences, physical or environmental conditions (including but not limited to Purchaser's phase one environmental assessment), availability of access, ingress or egress, operating projections, valuations, governmental approvals, governmental regulations or any other matter or thing relating to or affecting the operational, environmental or physical condition of the Property; (b) the value, condition, merchantability, marketability, profitability, suitability or fitness for a particular use or purpose of the Property; (c) the Property's compliance or non-compliance with Environmental Laws applicable to the Property or the presence or absence of hazardous or toxic materials, wastes or substances on, at or under the Property or migrating to or from the Property; or (d) the manner, quality, state of repair or lack of repair of the Property.

**6.5**  Survival. The provisions of this Article VI shall survive Closing.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

**7.1**   <u>Seller's Representations and Warranties</u>. Seller hereby makes the following representations and warranties to Purchaser, upon which Seller acknowledges and agrees that Purchaser is entitled to rely:

      7.1.1.  <u>Organization and Authority</u>. Consistent with the Plan and the Confirmation Order, (i) Seller has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Seller pursuant to this Agreement (collectively, the "<u>Seller Documents</u>"), and to perform the respective obligations of Seller under each of the Seller Documents, (ii) the execution and delivery by the signer on behalf of each party comprising Seller of each of the Seller Documents, and the performance by each party comprising Seller of its obligations under each of the Seller Documents, has been (or as of Closing will be) duly and validly authorized by all necessary action by each party comprising Seller, and (iii) each of the Seller Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Seller enforceable against the Parties comprising Seller in accordance with their terms, except to the extent Purchaser is in default thereunder.

      7.1.2.  <u>No Conflicting Agreements</u>. The execution and delivery by Seller of, and the performance of and compliance by Seller with, the terms and provisions of this Agreement, do not (a) conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, Seller's by-laws, or any other agreement or instrument to which Seller is a Party or by which all or any part of the Property is bound, (b) violate any restriction, requirement, covenant or condition to which all or any part of the Property is bound, (c) constitute a violation of any applicable code, resolution, law, statute, regulation, ordinance or rule applicable to Seller or the Property, (d) constitute a violation of any judgment, decree or order applicable to Seller or specifically applicable to the Property, or (e) require the consent, waiver or approval of any third party.

      7.1.3.  <u>Title</u>. To the best of Seller's knowledge, there are no unrecorded or undisclosed documents or other matters which affect title to the Property.

      7.1.4.  <u>FIRPTA</u>. Seller is not a "foreign person" within the meaning of Section 1445(f) of the Code.

      7.1.5.  <u>Condemnation Proceedings/Property Damage</u>. To the best of Seller's knowledge, there are no presently pending or, to the best of Seller's knowledge, contemplated proceedings to condemn the Property or any part of it.

      7.1.6.  <u>Option to Purchase.</u> Seller has not granted any option or other right to purchase or otherwise acquire any portion of the Property, or any interest therein, to any party except Purchaser pursuant to this Agreement and there are no existing and outstanding agreements affecting or relating to the Property, including, but not limited to, agreements for the sale of the Property (or any portion thereof), option agreements, leases, licenses, or powers of attorney, to which the Seller is a party or by which the Seller or the Property is bound.

      7.1.7.  <u>Environmental Matters</u>.

14

(a)      Seller has delivered to Purchaser copies of all material, non-privileged reports, assessments, audits, studies, analyses, and tests initiated by or on behalf of or in the possession of Seller pertaining to the environmental condition of, or any Hazardous Substance in, on, or under, the Property or concerning compliance by Seller with Environmental Laws.

(b)      This Section 7.1.7 contains the sole and exclusive representations and warranties of Seller with respect to matters arising under Environmental Laws or any other environmental matters.

7.1.8.   <u>Anti-Terrorism</u>. None of Seller's property or interests is subject to being "blocked" under any Anti-Terrorism Laws and neither Seller nor any Person holding any direct or indirect interest in Seller is in violation of any Anti-Terrorism Laws. Neither Seller nor any of their affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents (collectively, a "<u>Seller Party</u>") is, nor will they become: (a) a person or entity, or owned or controlled by a person or entity, with whom U.S. persons or entities are restricted from doing business, or with whom U.S. persons or entities may transact business only subject to the imposition of significant fines and penalties, under regulations of the Office of Foreign Asset Control ("<u>OFAC</u>") of the U.S. Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action; (b) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the USA Patriot Act of 2001, Pub. L. No. 107-56, Executive Order 13224 (September 23, 2001), or any executive orders of the President issued pursuant to such statutes; or (c) controlled by the government of any country or person that is subject to an embargo by the U.S. government, including without limitation OFAC, that prohibits Purchaser from conducting the business activities contemplated by this Agreement with Seller. Seller (a) is in compliance with, (b) is not under investigation by any governmental authority; (c) has not been charged with, convicted of, or assessed civil or criminal penalties; and (d) has not had any of its funds seized or forfeited in any action, for violation of any applicable anti-money laundering laws, including without limitation, the USA Patriot Act, the Bank Secrecy Act, 31 U.S.C. §5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. §1 et seq., Executive Order 13224 (September 23, 2001), the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, and laws relating to prevention and detection of money laundering in 18 U.S.C. §§ 1956-57.

7.1.9.   <u>Survival.</u> All of the representations, warranties, and covenants made by Seller with regard to Environmental Matters contained in Section 7.1.7 survive Closing.

**7.2**   <u>Purchaser Representations and Warranties</u>. Purchaser hereby makes the following representations and warranties to Seller, upon which Purchaser acknowledges and agrees that Seller is entitled to rely.

7.2.1.   <u>Organization and Authorization</u>. Purchaser has full power and authority to enter into this Agreement, to perform this Agreement and to consummate the transactions contemplated hereby. To the extent applicable, the execution, delivery and performance of this Agreement and all documents contemplated hereby have been duly and validly authorized by all necessary action

on the part of Purchaser and all required consents and approvals have been duly obtained and will not result in a breach of any of the terms or provisions of, or constitute a default under, any indenture, agreement or instrument to which Purchaser is a Party or otherwise bound.

7.2.2.  <u>Authority and Binding Obligation</u> (i) Purchaser has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Purchaser pursuant to this Agreement (the "<u>Purchaser Documents</u>"), and to perform all obligations of Purchaser arising under each of the Purchaser Documents, (ii) the execution and delivery by the signer on behalf of Purchaser of each of the Purchaser Documents, and the performance by Purchaser of its obligations under each of the Purchaser Documents, has been duly and validly authorized by all necessary action by Purchaser, and (iii) each of the Purchaser Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms, except to the extent Seller is in default thereunder.

7.2.3.  <u>No Conflicting Agreements.</u> The execution, delivery and performance of this Agreement and all documents contemplated hereby by Purchaser have been duly and validly authorized by all necessary action on the part of Purchaser and all required consents and approvals have been duly obtained and will not result in a breach of any of the terms or provisions of, or constitute a default under, any indenture, agreement or instrument to which Purchaser is a Party or otherwise bound.

7.2.4.  <u>Sufficient Funds</u>. Purchaser represents it has sufficient funds and/or assets to pay the full amount of the Purchase Price and consummate the Closing, without the need to obtain any financing.

7.2.6.  <u>No Violation of Anti-Terrorism Laws</u>None of Purchaser's property or interests is subject to being "blocked" under any Anti-Terrorism Laws, and neither Purchaser nor any Person holding any direct or indirect interest in Purchaser is in violation of any Anti-Terrorism Laws. Neither Purchaser nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents (collectively, a "<u>Purchaser Party</u>") is, nor will they become: (a) a person or entity, or owned or controlled by a person or entity, with whom U.S. persons or entities are restricted from doing business, or with whom U.S. persons or entities may transact business only subject to the imposition of significant fines and penalties, under regulations of the OFAC of the U.S. Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action; (b) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the USA Patriot Act of 2001, Pub. L. No. 107-56, Executive Order 13224 (September 23, 2001), or any executive orders of the President issued pursuant to such statutes; or (c) controlled by the government of any country or person that is subject to an embargo by the U.S. government, including without limitation OFAC, that prohibits Seller from conducting the business activities contemplated by this Agreement with Purchaser.<u>Patriot Act.</u> Purchaser, including its Purchaser Parties,

(a) is in compliance with, (b) is not under investigation by any governmental authority; (c) has not been charged with, convicted of, or assessed civil or criminal penalties; and (d) has not had any of its funds seized or forfeited in any action, for violation of any applicable anti-money laundering laws, including without limitation, the USA Patriot Act, the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. § 1 et seq., Executive Order 13224 (September 23, 2001), the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, and laws relating to prevention and detection of money laundering in 18 U.S.C. §§ 1956-57.

7.2.7.  <u>Florida Foreign Ownership Act Compliance</u>.  Purchaser is aware of and familiar with §692.201 through §692.205, Florida Statutes, entitled "Conveyances to Foreign Entities," (the "<u>Florida Foreign Ownership Act</u>"), which provides for certain restrictions against ownership by foreign principals of the following designated foreign countries of concern of certain real property located in the State of Florida, as such terms and lands are defined and more fully described in the Florida Foreign Ownership Act.  Purchaser is not prohibited from acquiring the Property by the provisions of the Florida Foreign Ownership Act.

(1) The People's Republic of China,

(2) the Russian Federation,

(3) the Islamic Republic of Iran,

(4) the Democratic People's Republic of Korea,

(5) the Republic of Cuba,

(6) the Venezuelan regime of Nicolás Maduro, or

(7) the Syrian Arab Republic; and

(8) any agency of or any other entity under significant control of such foreign country of concern.

7.2.8.  <u>Survival.</u> All of the representations, warranties, and covenants made by Purchaser survive Closing.

## ARTICLE VIII
## COVENANTS

**8.1** <u>Conduct of the Business</u>.

8.1.1.  <u>Operation in Ordinary Course of Business</u>. From the Effective Date until the Closing or earlier termination of this Agreement, Seller will operate the Property in the ordinary course, including maintaining current insurance coverages.

8.1.2.  <u>Contracts</u>. From the Effective Date until the Closing or earlier termination of this Agreement, Seller shall not, without Purchaser's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) or Bankruptcy Court order, (i) amend, extend, renew or terminate any Leases, Executory Contracts or licenses and permits regarding the

Property, except in the ordinary course of business or (ii) enter into any new Leases or Executory Contracts regarding the Property.

**8.2**    Tax Contests.

8.2.1.    Taxable Period Terminating Prior to Closing Date. Seller shall retain the right to commence, continue and settle any proceeding to contest any Taxes for any taxable period which terminates prior to the Closing, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings. Seller represent that it has not initiated any tax contest for a taxable period which includes the Closing Date and any periods thereafter.

**8.3**    Further Assurances. From the Effective Date until the Closing or earlier termination of this Agreement, Seller and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transaction described in this Agreement, including, without limitation, (i) obtaining all necessary consents, approvals and authorizations required to be obtained from any Governmental Authority or other Person under this Agreement or Applicable Law, and (ii) effecting all registrations and filings required under this Agreement or Applicable Law. After the Closing, Seller and Purchaser shall use commercially reasonable efforts (at no cost or expense to such Party, other than any de minimis cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to further effect the transaction contemplated in this Agreement.

**ARTICLE IX**
**CLOSING CONDITIONS**

**9.1**    Mutual Closing Condition.

9.1.1.    Satisfaction of Mutual Closing Condition. The respective obligations of Seller and Purchaser to close the transaction contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the "Mutual Closing Condition"): (1) the Bankruptcy Court shall have entered the final unappealable Sale Order; (2) the Bankruptcy Court shall have entered final unappealable judgment in each Section 363(h) Proceeding authorizing Seller to sell the Association Interest jointly with the sale of the interests of all Association Members in the Property; and (3) there shall be no applicable stay ordered by the Bankruptcy Court which is in effect.

9.1.2.    Failure of Mutual Closing Condition. If the Mutual Closing Condition is not satisfied at the Closing, then each Party shall have the right to terminate this Agreement by providing written notice to the other Party, in which case the Earnest Money Deposit shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except for those which expressly survive such termination.

**9.2**    Purchaser Closing Conditions.

9.2.1.    Satisfaction of Purchaser Closing Conditions. In addition to the Mutual Closing Condition, Purchaser's obligations to close the transactions described in this Agreement are subject

18

to the satisfaction at or prior to Closing of the following conditions precedent (the "Purchaser Closing Conditions"):

(a)      Seller's Deliveries. All of the Seller Closing Deliveries (as hereinafter defined) shall have been delivered to Purchaser or deposited with Escrow Agent to be held by the Escrow Agent in escrow and to be delivered to Purchaser upon the consummation of the Closing.

(b)      Representations and Warranties. The representations or warranties of Seller in this Agreement (as qualified by any schedules to this Agreement and any amendments or supplements to such schedules) shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

(c)      Covenants and Obligations. The material covenants and material obligations of Seller in this Agreement shall have been performed in all material respects.

Failure of Purchaser Closing Condition. If any of the Purchaser Closing Conditions are not satisfied on the Closing Date (as the same may be extended, adjourned, or postponed by Seller or Purchasers to the extent they have the express right to do so under this Agreement), then Purchaser shall have the right (i) to terminate this Agreement by providing written notice to Seller, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (ii) to waive any of the Purchaser Closing Conditions at or prior to Closing, without offset or deduction from the Purchase Price; provided, however, that any such waiver shall be made in writing by Purchaser. Nothing contained herein shall be deemed or construed to limit Purchaser's rights under Section 12.1 hereof.

Seller Closing Conditions.

Satisfaction of Seller Closing Conditions. In addition to the Mutual Closing Condition, Seller's obligations to close the transactions contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the "Seller Closing Conditions"):

Receipt of the Purchase Price. Purchaser shall have (A) deposited with Escrow Agent with written direction to disburse the same in accordance with the provisions of the Sale Order and/or other applicable Order, the Purchase Price (as adjusted pursuant to Section 3.1 hereof), and (B) delivered written direction to Escrow Agent to disburse the Earnest Money in accordance with the provisions of the Escrow Agreement and/or other applicable Order.

Purchaser's Deliveries. All of the Purchaser Closing Deliveries (as hereinafter defined) shall have been delivered to Seller or deposited with Escrow Agent to be held by the Escrow Agent in escrow and to be delivered to Seller at the Closing.

Representations and Warranties. The representations and warranties of Purchaser in this Agreement shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

Covenants and Obligations. The covenants and obligations of Purchaser in this Agreement shall have been performed in all material respects.

Failure of Seller Closing Condition. If any of the Seller Closing Conditions is not satisfied on the Closing Date, then Seller shall have the right to (i) terminate this Agreement by providing written notice to Purchaser, in which case the Earnest Money shall be disbursed to Seller in accordance with Section 3.2.2 hereof, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (ii) waive any of the Seller Closing Conditions at or prior to Closing; provided, however, that any such waiver shall be made in writing executed by Seller. Nothing contained herein shall be deemed or construed to limit Seller's rights under Section 12 hereof.

## ARTICLE X
## CLOSING

Closing Date. Closing of the transaction described in this Agreement (the "Closing") shall occur no later than fourteen (14) days after the later of (a) the entry of the Sale Order approving the transaction described in this Agreement, or (b) the entry of a final and unappealable order or judgment of the Court in the Section 363(h) Proceedings authorizing Seller to sell the Association Interest jointly with the sale of the interests of all Association Members in the Property, or such other date as agreed to in writing between Seller and Purchaser (the date on which the Closing occurs is referred to herein as the "Closing Date").

Closing Deliveries.

Seller's Deliveries. At the Closing, Seller shall deliver or cause to be delivered to Purchaser or deposited with Escrow Agent in the Escrow Agent's escrow account for Closing to be delivered to Purchaser at the Closing, all of the (i) documents set forth in this Section 10.2.1, each of which shall have been duly executed by Seller and acknowledged (if required) and (ii) other items set forth in this Section 10.2.1 (the "Seller Closing Deliveries"), as follows:

(a)    Deeds conveying the Property to Purchaser, subject to the Permitted Exceptions, to the extent applicable, respectively, to the Property (collectively, the "Deeds");

(b)    Title Documents. Such other documents and instruments, executed and properly acknowledged by Seller, if applicable, as Title Company may require from Seller in order to issue the Title Policy, including but not limited to affidavits of Title and limited liability company resolutions in a form reasonably acceptable to the Purchaser's Title Company;

(c)    A FIRPTA affidavit in the form set forth in the regulations under Section 1445 of the Code;

(d)    A resolution of each party comprising Seller, signed by each party comprising Seller's authorized representative, authorizing the execution of this Agreement and the consummation of the transactions contemplated hereby;

(e)    The Executory Contract Order;

(f)    The Closing Statement;

(g)     Such other documents and instruments as may be reasonably requested by Purchaser in order to consummate the transaction described in this Agreement;

Purchaser's Deliveries. At the Closing, Purchaser shall deliver or cause to be delivered to Seller or deposited with Escrow Agent in the Escrow Agent's escrow account for Closing to be delivered to Seller all of the (i) documents set forth in this Section 10.2.2, each of which shall have been duly executed by Purchaser and acknowledged (if required), and (ii) other items set forth in this Section 10.2.2 (the "Purchaser Closing Deliveries"), as follows:

(a)     The Purchase Price (as adjusted pursuant to this Agreement) to be paid by Purchaser;

(b)     A letter of direction to Escrow Agent authorizing and directing Escrow Agent to disburse the Earnest Money to Seller or to such party or parties as Seller shall designate;

(c)     A counterpart of each of the documents and instruments to be delivered by Seller under Section 10.2 hereof which require execution by Purchaser;

(d)     Affidavit and acknowledgment as required under the Florida Foreign Ownership Act and Florida Administrative Code rules promulgated thereunder;

(e)     Such other documents and instruments as may be reasonably requested by Seller or the Title Company in order to consummate the transaction described in this Agreement;

(f)     The Cure Amounts required under the Executory Contract Order; and

Possession. Seller shall deliver possession of the Property and Property to Purchaser upon completion of the Closing, subject to the rights of counterparties under the Purchased Contracts.

## ARTICLE XI
## PRORATIONS AND EXPENSES

**11.1**    Items to Be Prorated. The following shall be prorated between Seller and Purchaser as of the Closing Date with Purchaser being deemed the owner of the Property as of the Closing Date and with Purchaser receiving credit for or charged with the entire day of the Closing: Taxes, Water and Sewer (the "Prorations"). Except as hereinafter expressly provided, all prorations shall be done on the basis of the actual number of days in the year in which Closing occurs for the actual number of days elapsed to the Closing Date or the actual number of days in the month in which the Closing occurs and the actual number of days elapsed in such month to the Closing Date, as applicable. Any assessment for improvements completed prior to closing shall be Seller's responsibility. Notwithstanding anything else set forth herein, in the event any unpaid utilities could become liens, then Seller shall obtain a final reading within three days prior to the Closing, failing which Seller shall escrow a reasonable amount with the title company.

**11.2**    Taxes. If Taxes for the year of Closing are not known or cannot be reasonably estimated, then Taxes will be prorated based on Taxes for the year [●], at the maximum discount allowable ([●] Payment Amount) which taxes, notwithstanding anything to the contrary contained in this Agreement, and when actual figures are available, an adjustment will be made after Closing, with

appropriate credit to Seller or Purchaser as applicable.  The provisions of this Section 11.2 will survive the Closing.

**11.3** <u>Closing Costs</u>. Closing costs will be allocated between Seller and Purchaser and paid at the Closing as follows:

| COST | RESPONSIBLE PARTY |
|---|---|
| Costs of Seller's delivery of the Property Information | Seller |
| Costs of Purchaser's investigation of the Land and Property and feasibility of acquiring the Property | Purchaser |
| Title Commitment or updates and other Title Company administrative fees and charges | Purchaser |
| Premium for ALTA Title Policy | Purchaser |
| ALTA Title Policy endorsement premiums for any additional endorsements desired by Purchaser | Purchaser |
| Any tax, municipal and utility lien searches and certificates | Purchaser |
| Deed recording fees | Purchaser |
| Costs of the Survey | Purchaser |
| Documentary stamp tax on the Deed, if applicable | Seller (to the extent not prohibited by Section 1146(a) of the Bankruptcy Code) |
| Closing Fee charged by Escrow Agent for conducting the Closing | ½ Seller and ½ Purchaser |
| Brokerage Commissions (subject to Bankruptcy Court approval) | Seller |
| All other closing costs, expenses, charges and fees, including attorneys' fees | The party incurring same |

## ARTICLE XII
## DEFAULT AND REMEDIES

**12.1** <u>Seller Default</u>. If, at the time of Closing, Seller fails to perform their material covenants or material obligations under this Agreement (a "<u>Seller Default</u>") and no Purchaser Default (as hereinafter defined) has occurred that has prevented the satisfaction of the conditions to the obligations of Purchaser to close the transactions set forth in Section 9 hereof, then Purchaser, as

its sole and exclusive remedy, may elect upon written notice to Seller to (a) provide notice of such Seller Default, and if Seller fails to remedy the Seller Default within fifteen (15) days thereafter, this Agreement shall terminate (a "Seller's Breach Termination Event") and the Earnest Money Deposit shall be refunded to Purchaser, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination; (b) proceed to Closing without offset or deduction to the Purchase Price; or (c) obtain a court order for specific performance. Purchaser hereby waives any and all other rights and/or remedies it may otherwise have at law and/or in equity.

**12.2**    Purchaser's Default. If Purchaser fails to perform any of its material covenants or material obligations under this Agreement (a "Purchaser Default") and no Seller Default has occurred which remains uncured, then Seller, as its sole and exclusive remedy, may elect to (a) terminate this Agreement by providing written notice to Purchaser, in which case the Earnest Money Deposit shall be disbursed to Seller in accordance with Section 3 hereof, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (b) proceed to Closing pursuant to this Agreement.

**12.3**    LIQUIDATED DAMAGES. THE PARTIES ACKNOWLEDGE AND AGREE THAT IF THIS AGREEMENT IS TERMINATED PURSUANT TO SECTION 12 HEREOF, THE DAMAGES THAT SELLER WOULD SUSTAIN AS A RESULT OF SUCH TERMINATION WOULD BE DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN. ACCORDINGLY, THE PARTIES AGREE THAT SELLER SHALL RETAIN THE EARNEST MONEY DEPOSIT, FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTEREST, AS A FAIR AND REASONABLE SUM AND AS FAIR MEASURE OF DAMAGES, AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY) AS SELLER'S SOLE AND EXCLUSIVE REMEDY FOR SUCH TERMINATION. NOTWITHSTANDING THE FOREGOING, THE REMEDY OF LIQUIDATED DAMAGES SHALL NOT LIMIT, AND SHALL NOT BE DEEMED TO LIMIT, IN ANY WAY THE RIGHTS AND REMEDIES AVAILABLE TO SELLER WHICH SURVIVE TERMINATION OF THIS AGREEMENT.

### ARTICLE XIII
### RISK OF LOSS

**13.1**    Casualty. If, at any time after the Effective Date and prior to Closing or earlier termination of this Agreement, the Property or any portion thereof is damaged or destroyed by fire or any other casualty (a "Casualty"), Seller shall give written notice of such Casualty to Purchaser promptly after the occurrence of such Casualty.

13.1.1. Material Casualty. If the amount of the repair restoration of the Property required by a Casualty equals or exceeds twenty-five percent (25%) of the Purchase Price, as estimated by Seller's architect (a "Material Casualty") then Purchaser shall have the right to elect, by providing written notice to Seller within ten (10) days after Purchaser's receipt of the estimate from Seller's architect, to (a) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (b) proceed to Closing, without terminating this Agreement, in which case Seller shall (i) provide Purchaser with a credit against the Purchase Price in an amount equal to the lesser of: (A) the applicable insurance deductible, and (B) and the

reasonable estimated costs for the repair or restoration of the Property required by such Material Casualty, and (ii) transfer and assign to Purchaser all of Seller's right, title and interest in and to all proceeds from all casualty and lost profits insurance policies maintained by Seller with respect to the Property or the Business. If the Closing is scheduled to occur within Purchaser's ten (10) day election period, the Closing Date shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) day election period.

13.1.2. <u>Non-Material Casualty</u>. In the event of any Casualty which is not a Material Casualty, then Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Seller shall (A) provide Purchaser with a credit against the Purchase Price in an amount equal to the lesser of: (1) the applicable insurance deductible under Seller's applicable insurance policy, and (2) the reasonable estimated costs for the repair or restoration required by such Casualty, and (B) transfer and assign to Purchaser all of Seller's right, title and interest in and to all proceeds from all casualty insurance policies maintained by Seller with respect to the Property.

**13.2** <u>Condemnation</u>. If, at any time after the Effective Date and prior to Closing or the earlier termination of this Agreement, any Governmental Authority commences any condemnation proceeding or other proceeding in eminent domain with respect to all or any portion of the Property (a "<u>Condemnation</u>"), Seller shall give written notice of such Condemnation to Purchaser promptly after Seller receive notice of such Condemnation.

13.2.1. <u>Material Condemnation</u>. If the Condemnation would (i) result in the permanent loss of more than twenty-five percent (25%) of the fair market value of the Land or Improvements of the Property, (ii) result in any permanent material reduction or restriction in access to the Land or Improvements of the Property, or (iii) have a permanent materially adverse effect on the Business as conducted prior to such Condemnation (a "<u>Material Condemnation</u>"), then Purchaser shall have the right to elect, by providing written notice to Seller within ten (10) days after Purchaser's receipt of Seller's written notice of such Material Condemnation, to (A) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing, without terminating this Agreement, in which case Seller shall assign to Purchaser all of Seller's right, title and interest in all proceeds and awards from such Material Condemnation. If the Closing is scheduled to occur within Purchaser's ten (10) day election period, the Closing shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) day election period.

13.2.2. <u>Non-Material Condemnation</u>. In the event of any Condemnation other than a Material Condemnation, Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Seller shall assign to Purchaser all of Seller's right, title and interest in all proceeds and awards from such Condemnation.

**ARTICLE XIV**
**SURVIVAL**

**14.1** <u>Survival</u>. Except only as expressly set forth in this Section 14.1, all representations, warranties, covenants, liabilities and obligations shall be deemed (i) if the Closing occurs, to merge

in the Deed and not survive the Closing, or (ii) if this Agreement is terminated, not to survive such termination.

14.1.1. <u>Survival of Representations and Warranties</u>. The payment of the Purchase Price by Purchaser and the delivery of the deed(s) by Seller to Purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement.

14.1.2. <u>Survival of Covenants and Obligations</u>. If this Agreement is terminated, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the termination of this Agreement shall survive such termination. If the Closing occurs, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the Closing shall survive the Closing.

<u>Survival of Indemnification</u>. All rights and obligations of defense and indemnification as expressly set forth in this Agreement shall survive the Closing or termination of this Agreement.

14.1.4. Notwithstanding anything to the contrary contained herein, Articles II, VI, XII and XIV and Sections 3.2.2, 7.1.7, 7.2 and 11.2 hereof shall survive the termination of this Agreement.

## ARTICLE XV
## MISCELLANEOUS PROVISIONS

<u>Notices</u>.

<u>Method of Delivery</u>. All notices, requests, demands and other communications required to be provided by any Party under this Agreement (each, a "<u>Notice</u>") shall be in writing and delivered, at the sending Party's cost and expense, by (i) personal delivery, (ii) certified U.S. mail, with postage prepaid and return receipt requested, (iii) overnight courier service, or (iv) facsimile transmission, with a verification copy sent on the same day by any of the methods set forth in clauses (i), (ii) or (iii), to the recipient Party at the following address, facsimile number or e-mail address:

<u>If to Seller</u>:

_____
_____
_____
Attn: _____
E-mail address: _____

With Required Copy to:

K&L Gates LLP
One Newark Center, 10th Fl.
1085 Raymond Blvd.

Newark, NJ 07102
Attention:
Daniel Eliades, Esq
Daniel.eliades@klgates.com
Jennifer Mazawey, Esq.
Jennifer.mazawey@klgates.com
William Waldman, Esq.
william.waldman@klgates.com
Jeffrey Kucera, Esq.
Jeffrey.kucera@klgates.com
Carly Everhardt, Esq.
Carly.everhardt@klgates.com

If to Purchaser:

_____
_____
Attn: _____
E-mail address: _____

With a copy to:

_____
_____
Attn: _____
E-mail address: _____

15.1.2. <u>Receipt of Notices</u>. All Notices sent by a Party (or its counsel pursuant to Section 15.1.4 hereof) under this Agreement shall be deemed to have been received by the Party to whom such Notice is sent upon (i) delivery to the address or facsimile number of the recipient Party, provided that such delivery is made prior to 5:00 p.m. **[Eastern]** on a Business Day, otherwise the following Business Day, or (ii) the attempted delivery of such Notice if (A) such recipient Party refuses delivery of such Notice, or (B) such recipient Party is no longer at such address or facsimile number, and such recipient Party failed to provide the sending Party with its current address or facsimile number pursuant to Section 15.1.3 hereof.

15.1.3. <u>Change of Address</u>. The Parties and their respective counsel shall have the right to change their respective address and/or facsimile number for the purposes of this Section 15.1 by providing a Notice of such change in address and/or facsimile number as required under this Section 15.1.

15.1.4. <u>Delivery by Party's Counsel</u>. The Parties agree that the attorney for such Party shall have the authority to deliver Notices on such Party's behalf to the other Party hereto.

**15.2**    No Recordation. No Party shall record this Agreement, or any memorandum of this Agreement, in any public records.

**15.3**    Time is of the Essence. Time is of the essence as to all dates and/ or times, as applicable, set forth in this Agreement; provided, however, that notwithstanding anything to the contrary in this Agreement, if the time period for the performance of any covenant or obligation, satisfaction of any condition or delivery of any Notice or item required under this Agreement shall expire on a day other than a Business Day, such time period shall be extended automatically to the next Business Day.

**15.4**    Assignment. Purchaser shall not assign this Agreement or any interest therein to any Person, without the prior written consent of Seller, which consent may be withheld in Seller's sole discretion. Notwithstanding the foregoing, Purchaser shall have the right to designate any affiliate(s) (which is intended to be broader than the defined term "Affiliate") as its nominee to receive title to the Property, or assign all of its right, title and interest in this Agreement to any affiliate(s) of Purchaser by providing written notice to Seller no later than five (5) days prior to the Closing, provided that in any such event the originally named Purchaser shall remain liable for all Purchaser obligations hereunder.

**15.5**    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and permitted assigns.

**15.6**    Third Party Beneficiaries. This Agreement shall not confer any rights or remedies on any Person other than (i) the Parties and their respective successors and permitted assigns, and (ii) any Indemnitee to the extent such Indemnitee is expressly provided any right of defense or indemnification in this Agreement.

**15.7**    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF FLORIDA, WITHOUT GIVING EFFECT TO ANY PRINCIPLES REGARDING CONFLICT OF LAWS.

**15.8**    Rules of Construction. The following rules shall apply to the construction and interpretation of this Agreement:

15.8.1. Singular words shall connote the plural as well as the singular, and plural words shall connote the singular as well as the plural, and the masculine shall include the feminine and the neuter, as the context may require.

15.8.2. All references in this Agreement to particular articles, sections, subsections or clauses (whether in upper or lower case) are references to articles, sections, subsections or clauses of this Agreement. All references in this Agreement to particular exhibits or schedules (whether in upper or lower case) are references to the exhibits and schedules attached to this Agreement, unless otherwise expressly stated or clearly apparent from the context of such reference.

15.8.3. The headings in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

1607318176.1

15.8.4. Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement and have participated in the preparation of this Agreement, and therefore any rules of construction requiring that ambiguities are to be resolved against the Party which drafted the Agreement or any exhibits hereto shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

15.8.5. The term "sole discretion" with respect to any determination to be made a Party under this Agreement shall mean the sole and absolute discretion of such Party, without regard to any standard of reasonableness or other standard by which the determination of such Party might be challenged.

**15.9** Severability. If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected term or provision at any other time or in any other jurisdiction.

**15.10** JURISDICTION AND VENUE. ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT SHALL BE CONDUCTED IN THE BANKRUPTCY COURT AND SELLER (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY SUBMIT TO JURISDICTION AND CONSENT TO VENUE IN SUCH COURT AND WAIVE ANY DEFENSE BASED ON FORUM NON CONVENIENS.

**15.11** WAIVER OF TRIAL BY JURY. EACH PARTY HEREBY WAIVE ITS RIGHT TO A TRIAL BY JURY IN ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT. THE FOREGOING WAIVER IS MADE BY THE PARTIES KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AND IS SUBJECT TO NO EXCEPTIONS.

**15.12** Incorporation of Recitals, Exhibits and Schedules. The recitals to this Agreement, and all exhibits and schedules (as amended, modified and supplemented from time to time pursuant to Section 15.14 hereof) referred to in this Agreement are incorporated herein by such reference and made a part of this Agreement. Any matter disclosed in any schedule to this Agreement shall be deemed to be incorporated in all other schedules to this Agreement.

**15.13** Entire Agreement. This Agreement sets forth the entire understanding and agreement of the Parties hereto and shall supersede any other agreements and understandings (written or oral) between the Parties on or prior to the Effective Date with respect to the transaction described in this Agreement.

**15.14** Amendments, Waivers and Termination of Agreement. No amendment or modification to any terms or provisions of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

**15.15** Not an Offer. The delivery by Seller of this Agreement executed by Seller shall not constitute an offer to sell the Property, and Seller shall have no obligation to sell the Property to

Purchaser, unless and until all Parties have executed and delivered this Agreement to all other Parties.

**15.16**  <u>Execution of Agreement</u>. A Party may deliver executed signature pages to this Agreement by facsimile or electronic transmission to any other Party, which facsimile or electronic copy shall be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

**15.17**  <u>Substantial Contribution</u>. Purchaser hereby waives any right it may have to pursue a substantial contribution claim in the Bankruptcy Case pursuant to 11 U.S.C. §503.

**15.18**  <u>Real Estate Commission</u>. Seller and Purchaser each represent and warrant to the other that neither Seller nor Purchaser has contacted or entered into any agreement with any real estate broker, agent, finder or any other party in connection with this transaction other than Seller's broker, Hilco Real Estate LLC ("<u>Broker</u>"), and that neither Party has taken any action which would result in any real estate broker's, finder's or other fees or commissions being due and payable to any Party other than Broker with respect to the transaction contemplated hereby. Purchaser hereby indemnifies and agrees to hold the Seller harmless from any loss, liability, damage, cost, or expense (including reasonable attorneys' fees) resulting to the Seller by reason of a breach of the representation and warranty made by Purchaser in this Section. Seller hereby indemnifies and agrees to hold the Purchaser harmless from any loss, liability, damage, cost, or expense (including reasonable attorneys' fees) resulting to the Purchaser by reason of a breach of the representation and warranty made by Seller in this Section.

**15.19**  <u>Radon Gas Disclosure</u>. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your County Health Unit.

**[Remainder of page intentionally left blank;
Signatures on following pages]**

29

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed and delivered in its name by a duly authorized officer or representative.

**SELLER:**
**STAR ISLAND VACATION**
**OWNERSHIP ASSOCIATION, INC.**

_____     By:_____
                                    Name:
                                    Title:

**PURCHASER:**

_____     By:_____
                                    Name:
                                    Title:

**EXHIBIT A**

**<u>EXHIBIT B</u>**

**<u>LEASES</u>**[2]

---

[2] **[Note: To be completed per Bid of Purchaser]**

## **EXHIBIT C**

## **FORM OF SALE ORDER**

# **EXHIBIT D**

# **FORM OF EARNEST MONEY ESCROW AGREEMENT**

**<u>EXHIBIT E</u>**

**<u>ENVIRONMENTAL DOCUMENTS</u>**[3]

---

[3] **[Note: To be completed per Bid of Purchaser]**

## LIST OF SCHEDULES[4]

Schedule 1          Executory Contracts

Schedule 2          Unexpired Leases

Schedule 3          Equipment Leases

---

[4] **[Note: Schedules to be prepared per Bid of Purchaser]**