**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
www.flmb.uscourts.gov

In re:

STAR ISLAND VACATION
OWNERSHIP ASSOCIATION, INC.,[1]

Debtor.

_____/

CASE NO. 6:25-bk-07207

CHAPTER 11

SUBCHAPTER V

**DEBTOR-IN-POSSESSION'S EXPEDITED MOTION FOR ENTRY OF AN
ORDER AUTHORIZING THE LATE DESIGNATION AND APPROVAL OF A
STALKING HORSE BIDDER, INCREASING THE BREAK-UP FEE, AND
RELIEF[2]**

STAR ISLAND VACATION OWNERSHIP ASSOCIATION, INC. (the "Debtor" or the "Association") hereby submits its Motion for Entry of an Order Authorizing the Late Designation and Approval of a Stalking Horse Bidder and Related Relief (the "Motion"), pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1, and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida (the "Local Rules"), requests the Court enter an order granting the Debtor approval to designate Star Island Development Corp. as the Stalking Horse Bidder[3] and to increase the Break-Up Fee from three percent (3%) to four percent (4%) and in support thereof states as follows:

---

[1] The last four digits of Debtor's tax identification number are 6210. Debtor's primary place of business is 5000 Avenue of the Stars, Kissimmee, Florida, 34746.

[2] The Debtor is seeking expedited relief due to the auction scheduled on April 9, 2026.

[3] Capitalized terms not defined herein shall have the meaning set forth in the Bidding Procedures Order (as defined below) and the Bid Procedures attached thereto.

**INTRODUCTION**

1.      Debtor has been diligently negotiating with various bidders regarding the sale of the Property.

2.      The Court previously entered an order: (a) approving the proposed marketing, auction, and bidding procedures attached as Exhibit 1 to the Order (the "Bidding Procedures"), pursuant to which Debtor will solicit and select the highest or otherwise best offer for the sale or other transaction (the "Sale Transaction") of the Property (as defined below); (b) establishing certain dates, deadlines and procedures related thereto and scheduling an auction, if any, for the Sale Transaction (the "Auction"); (c) approving the manner of notice of any Auction and corresponding sale approval hearing (the "Sale Hearing") as may be necessary; and (d) granting related relief. *See Order (I) (A) Approving Auction and Bidding Procedures, (B) Scheduling Bid Deadlines and an Auction, and (C) Approving the Form and Manner of Notice Thereof, and (II) (A) Setting Hearing to Approve Sale of Assets and (B) Granting Related Relief* [Doc. No. 102] (the "Bidding Procedures Order").

3.      The Bidding Procedures Order provides, *inter alia*, that the Debtor could designate a stalking-horse bid on or before January 30, 2026, and grant to any such stalking-horse bidder a Break-Up Fee of three percent (3%).

4.      The Debtor requests that the Court enter an order allowing the Debtor (a) to designate Star Island Development Corp. as the Stalking Horse Bidder after the deadline established by the Bidding Procedures Order, and (b) to increase the Break-Up Fee from three percent (3%) to four percent (4%).

5.      If the Debtor receives multiple qualifying bids for the Property, it will conduct an auction on April 9, 2026. The qualification of the Stalking Horse Bidder would affect the auction. For that reason, the Debtor requests the Court hear this matter prior to April 7, 2026.

6.      In support of the Motion, Debtor respectfully relies upon the Declaration of Jeannine Rodriguez in Support of Debtor's Chapter 11 Petition and Applications for First Day Relief (the "First Day Declaration"; Doc. No. 14).[4]

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the Middle District of Florida (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference of Cases Arising Under Title 11, United States Code, and Designating Bankruptcy Judges to Conduct Jury Trials and Act as Settlement Judges*, entered October 29, 2024 by the United States District Court for the Middle District of Florida (Corrigan, C.J.). Debtor confirms its consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1, and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida (the "Local Rules").

9.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

---

[4] Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

## I.  General Background

10.  On November 6, 2025 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

11.  Debtor is a not-for-profit corporation organized under the laws of the State of Florida pursuant to Articles of Incorporation filed with the Secretary of State of Florida, in Official Records Book CL 2000032355, OR 1709/1761, et. seq., on January 21, 2000.

12.  The Association was formed pursuant to a Declaration of Fairfield Orlando at Star Island dated January 24, 2000, and recorded on March 3, 2000 in the Official Records Book Of Osceola County Florida at CL 2000032355, OR 1709/1701; as amended by (i) the First Amendment to Declaration recorded in Official Records Book on May 25, 2001 at CL 2001068102, OR 1877/41; (ii) the Second Amendment to Declaration recorded in Official Records Book on April 1, 2003 at CL 2003054350, OR 2222/1046; (iii) the Second Amendment to Declaration (sic) recorded in Official Records Book on July 16, 2003 at CL 2003126664, OR 2293/2576; and (iv) the Third Amendment to Declaration recorded in Official Records Book on September 17, 2003 at CL 2003171947, OR 2340/919, (collectively, the "Declaration of Covenants, Conditions and Restrictions").

13.  The Declaration of Covenants, Conditions and Restrictions created a plan for development of a phased timeshare property and established the timeshare plan for the resort pursuant to the Florida Timeshare Act (the "Timeshare Plan"). The resort is managed, maintained and administered, in part, by the Association.

14.  The By Laws of the Association reflect that the Association was organized and exists to administer the Fairfield Orlando at Star Island, a resort located in Osceola County Florida. The original By Laws were dated January 24, 2000, and recorded on March 3, 2000 in the Official

Records Book of Osceola County Florida at CL 2000032355, OR 1709/1771. Those By Laws, as subsequently amended, are collectively referred to as the "By Laws".

15. Pursuant to Section 3.1 of the By Laws, the Association is governed by a Board of Directors (the "Board"). The current members of the Board are: Jeannine Rodriguez, President; Melissa Colvin, Vice President; and Courtney Padula, Secretary/Vice President.

16. Debtor is operating its business and managing its affairs as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

17. For a detailed description of Debtor and its operations, Debtor respectfully refers the Court and parties in interest to the First Day Declaration.

## II. The Resort Property and Property Governed by Association

18. The *Star Island Resort* is located at 5000 Avenue of the Stars, Kissimmee, Florida and consists of 17 buildings containing more than 500 units, with resort style amenities including a pool and tennis courts (the "Resort"). The property governed by the Association is a subpart of the Resort and consists of 4 buildings within the Resort containing a total of 184 units, including 148 connecting 2-bedroom units, 18 standard 2-bedroom units, and 18 3-bedroom units and their common areas (collectively, the "Property").

19. Through December 31, 2025, the Property was actively operated as a timeshare community. All units within the Property are fully furnished, and each includes a full kitchen.

## III. Entry of Bid Procedures Motion

20. On February 5, 2026, this Court entered the Bidding Procedures Order, which established January 30, 2026 as the deadline by which Debtor could, but was not required to, designate a stalking horse bidder (the "Stalking Horse Deadline").

21. In advance of and following entry of the Bidding Procedures Order, Debtor has

been engaged in good-faith, arms'-length negotiations with Star Island Development Corp. (the "Stalking Horse Bidder"), a Florida corporation, regarding a potential stalking horse transaction. The Stalking Horse Bidder is not related to or an affiliate of the Debtor.

22.     Although Debtor and the Stalking Horse Bidder made substantial progress prior to the Stalking Horse Deadline, the parties were unable to reach final agreement by that date on certain material issues, including title insurance and price. Importantly, those negotiations have continued post-deadline and have since progressed to a point where designation of the Stalking Horse Bidder would meaningfully benefit Debtor's estate and the ongoing sale process.

23.     The sale process has been meaningful and fully transparent. The Debtor's agent, Hilco Real Estate, LLC, has marketed the property to many, many potential bidders. Hilco exposed the Property to over 65,000 potential bidders through electronic advertising; over 100 bidders responded and/or executed confidentiality agreements to learn more; and several bidders have toured the Property and conducted other due diligence.

24.     Debtor has served the Bidding Procedures Order on all parties in interest, including all members and owners of the Association.

## RELIEF REQUESTED

25.     Debtor does not seek to modify or disturb the Court-approved Bidding Procedures previously entered in this case. Rather, Debtor seeks targeted relief authorizing the late designation of a stalking horse bidder pursuant to the Bidding Procedures Order, together with approval of the revised Break-Up Fee.

26.     As previously approved, the Bidding Procedures establish an open, fair, and competitive process for the solicitation, receipt, and evaluation of bids for the Property, including the conduct of an auction, if necessary, to ensure that the Property is sold to the highest and best

bidder in a manner designed to maximize value for Debtor's estate. Those procedures remain fully intact and continue to govern the sale process.

27.     Although the Bidding Procedures Order established January 30, 2026, as the deadline by which Debtor could designate a stalking horse bidder, the Bidding Procedures expressly preserve Debtor's discretion to seek Court approval of modifications to the sale process where appropriate to maximize value for the estate. Consistent with that authority, Debtor now seeks approval to designate the Stalking Horse Bidder as the stalking horse bidder after the Stalking Horse Deadline, based on continued good-faith negotiations that were not finalized by that deadline. Authorizing the late designation of a stalking horse bidder here is fully consistent with the purpose and structure of the Court-approved Bidding Procedures.

28.     In connection with the late designation of the Proposed Stalking Horse Bidder, Debtor also seeks approval of revised stalking horse bid protections. Specifically, Debtor requests authority to provide the stalking horse bidder with a break-up fee equal to four percent (4%) of the stalking horse bid (the "Break-Up Fee").

29.     The proposed increase of the Break-Up Fee from three percent (3%) to four percent (4%) is reasonable and appropriate under the circumstances and reflects, among other things, the increased risk assumed by the stalking horse bidder as a result of the late designation, the substantial diligence and negotiation efforts already undertaken, and the stalking horse bidder's agreement to set a binding floor price at a critical stage of the sale process. Debtor submits that the revised Break-Up Fee remains within market-accepted ranges for transactions of this nature and is necessary to secure the stalking horse bidder's continued participation for the benefit of the estate.

30.     Importantly, the Debtor does not believe that the increased Break-Up Fee will chill

bidding. Given the $7,000,000 price in the Stalking Horse Bid, overbidding would begin at $7,480,000.00 ($7,000,000 price, plus 4% or $280,000, plus $100,000 expense reimbursement, plus $100,000 minimum overbid). A copy of the Stalking Horse Purchase and Sale Agreement is attached to this Motion as **Exhibit A**.

31.     Finally, the Stalking Horse Bid is contingent on the Debtor seeking and obtaining the relief requested herein. Absent designation as stalking horse and the increased Break-Up Fee, the Stalking Horse Bidder has indicated it will significantly reduce its bid—which may lead to the end result that the Debtor may not realize the same price for the Property.

**Basis for Relief**

**I.      The Relief Sought Is in the Best interests of Debtor's Estate and Should be Approved.**

32.     "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold." John J. Jerome & Robert D. Drain, Bankruptcy Court is Newest Arena for M&A Action, N.Y.L.J., June 3, 1991; *see In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Lykes Bros. S.S. Co.*, 207 B.R. 282, 284 (Bankr. M.D. Fla. 1997) (recognizing that a fundamental principle of Chapter 11 is "the desire to maximize the value of the estate for the benefit of all creditors"). In furtherance of that goal, bidding procedures and bid protections, such as those proposed here, may be used in court-supervised asset sales because they streamline the acquisition process, "help to provide an adequate basis by which to compare offers," and maximize value. Jerome & Drain (1991) at 8, col. 4; *see In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Dura Automotive Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *90 (Bankr. D.

Del. Aug. 15, 2007) (recognizing that "procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales."); *In re Dunhill Entities, L.P.*, No. 10-01342, 2010 WL 6982623, at *1 (Bankr. S.D. Ala. Apr. 13, 2010) (approving bidding procedures that are "designed to maximize the [d]ebtors' recovery on the [a]ssets"); *In re Robb & Stucky Ltd. LLLP*, No. 8:11-bk-02801-CED (Bankr. M.D. Fla. Feb 23, 2011) (same).

> In overseeing an asset sale subject to an auction process, the bankruptcy court must weigh:
>
> on the one hand, providing for an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the bankrupt estate.

*In re Fin. News Network, Inc.*, 980 F.2d 165, 166 (2d Cir. 1992). Because the bankruptcy court must perform this balancing act, "a bankruptcy judge's broad discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly followed" that "reduce the broad discretion and flexibility a bankruptcy court must necessarily have to enhance the value of the estates before it." *Id.* at 169–70; *see also In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002) (considering the following factors: "(1) any improper or bad faith motive, (2) price is fair and the negotiations or bidding occurred at arm's length, (3) adequate procedure, including proper exposure to the market and accurate and reasonable notice to all parties in interest.").

33.     Here, Debtor submits that the designation of the Stalking Horse Bidder is a valid exercise of its business judgment, fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this Circuit, and in the best interest of its estate. Courts have consistently held that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re 160 Royal Palm,*

*LLC*, 600B.R. 119, 127 (S.D. Fla. 2019) (debtor has "broad discretion to determine the appropriate procedures for marketing and selling" assets of the bankruptcy estate); *Epic Aviation, LLC v. Phillips* (*In re Phillips*), 2013 WL 1899611, at *10 (M.D. Fla. May 7, 2013) (quoting *In re Nuttery Farm, Inc.*, 467 F. App'x 711, 712 (9th Cir. 2012)) ( "A trustee's management of the procedural details surrounding bidding and sale are 'ultimately a matter of discretion that depends upon the dynamics of the particular situation.'"); *In re Knott*, No. 6:12-BK-07764-KSJ, 2015 WL 251705, at *2 (Bankr. M.D. Fla. Jan. 20, 2015) ("Once a trustee provides . . . sound business reasons, his or her business judgment generally is entitled to a certain amount of deference");  *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [debtor] to show that a sound business purpose justifies such actions.' If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if: he has an 'articulated business justification'" (internal citations and quotations omitted)); *see Integrated Res.*, 147 B.R. at 656 (applying business judgment rule to bidding procedures and incentives and noting that "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence."). The business justification for the sale of the Property is well established in the First Day Declaration and well supported by Association Members – with more than 98% of the voting interests present at the pre-petition special membership meetings (in person or by proxy) having voted in favor of a sale of the Property in bankruptcy. *See, e.g.* First Day Declaration at ¶¶ 29-31.

34.     Approving the Stalking Horse Bidder at this stage will not prejudice parties in interest, will not disrupt the existing sale timeline, and will further Debtor's fiduciary obligation

to maximize value for the estate by establishing a floor bid and encouraging competitive bidding. Debtor believes that approval of the Stalking Horse Bidder will maximize the value of the Property for the benefit of Debtor's estate. Importantly, Debtor's marketing efforts were not limited to the Stalking Horse Bidder. Prior to and following entry of the Bidding Procedures Order, the Debtor, through its professionals, actively marketed the Property and received interest from multiple third parties, several of whom executed confidentiality agreements and were granted access to diligence materials. These efforts confirm that the sale process has been open, competitive, and subject to meaningful market exposure.

35.     Accordingly, Debtor respectfully requests that the Court authorizes the Debtor to designate the Stalking Horse Bidder as a valid exercise of Debtor's business judgment.

36.     The Debtor further submits that the increased Break-Up Fee is appropriate. Bidding protections, such as those proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313-14; *In re Just One More Restaurant Corp.*, Case No. 9:19-bk-1947 (Bankr. M.D. Fla. Feb. 25, 2020) (deeming a termination fee "an actual and necessary cost of preserving the [d]ebtors' estates within the meaning of section 503(b) of the Bankruptcy Code"). Thus, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (quoting *O'Brien*, 181 F.3d at 535) (internal quotations omitted).

37.     Courts in the Eleventh Circuit and others have routinely approved break-up fees and/or expense reimbursements offered to stalking horse bidders. *See, e.g., In re Lake Burton Development, LLC*, No. 09–22830 (Bankr.N.D.Ga. Apr. 1, 2010) (approving break-up fee equal to 4.75% of the cash purchase price); *In re Dan River, Inc.,* No. 04–10990 (Bankr.N.D.Ga. Dec.

17, 2004) (approving break-up fee equal to 5.3% of the cash purchase price); *In re Texas Rangers Baseball Partners*, 431 B.R. 706, 715 (Bankr. N.D. Tex. 2010) (noting breakup fees of as much as 4% have been approved).

38.     Debtor believes that the increased Break-Up Fee is in the best interests of Debtor's estate and its creditors, as the Stalking Horse Bidder will establish a floor for further bidding that may increase the consideration ultimately realized for the Property. Indeed, the Stalking Horse Bidder will only get paid because Debtor accepted a higher or otherwise superior Qualified Bid for the Property. In short, the proposed Break-Up Fee is fair and reasonable under the circumstances because same would constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *In re Integrated Res., Inc.*, 147 B.R. at 662.

39.     Accordingly, Debtor should be granted the authority, but not direction, to offer the increased Break-Up Fee.

**IV.     Reservation of Rights**

40.     Notwithstanding the foregoing, Debtor reserves all rights to: (i) determine which bids are Qualified Bids; (ii) determine which Qualified Bid is the highest or otherwise best bid and which is the next highest or otherwise best bid; (iii) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with these sales procedures, or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of Debtor; and (iv) waive terms and conditions set forth herein with respect to Qualified Bids.

**Notice**

41.     Debtor will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the Office of the United States Trustee for the Middle District

of Florida; (b) all Association Members; (c) Debtor's 20 largest unsecured creditors; (d) the United States Attorneys' Office for the Middle District of Florida; (e) the Internal Revenue Service; (f) the U.S. Securities and Exchange Commission; (g) the Office of the Attorney General for the State of Florida; (h) the Florida Department of Revenue; (i) the Subchapter V Trustee; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, Debtor respectfully requests that the Court enter an order, in substantially the form submitted herewith as **Exhibit B**, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: March 30, 2026

Respectfully submitted,

*/s/ Jeffrey T. Kucera*
Jeffrey T. Kucera
Carly S. Everhardt
**K&L GATES LLP**
Southeast Financial Center, Suite 3900 200 South Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 539-3300
Email: jeffrey.kucera@klgates.com

- and -

Daniel M. Eliades (Admitted *pro hac vice*) Peter J. D'Auria (Admitted *pro hac vice*) **K&L GATES LLP**
One Newark Center, Tenth Floor Newark, NJ 07102
Telephone: (973) 848-4000
Email: daniel.eliades@klgates.com
        peter.dauria@klgates.com

*Counsel for Debtor and Debtor-in-Possession*